THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. STEVEN C. BOSSE, Defendant-Appellee.

Fourth District   No. 4—92—0350

Opinion filed December 10, 1992.

Charles Colburn, State's Attorney, of Jacksonville (Norbert J. Goetten, Robert J. Biderman, and Jeffrey K. Davison, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

David E. Leefers, of Jacksonville, for appellee.

JUSTICE McCULLOUGH delivered the opinion of the court:

Defendant Steven C. Bosse was charged by information with the unlawful possession, with intent to deliver, of more than 10 grams, but not more than 30 grams, of a substance containing cannabis. (Ill. Rev. Stat. 1991, ch. 56½, par. 705(c).) In the circuit court of Morgan County, a hearing was conducted on defendant's motion to suppress evidence discovered in his apartment following a warrantless search. The trial court granted the motion to suppress, and the State appeals that order.

When the trial court decides to suppress evidence, generally that decision will be overturned by a reviewing court only if the State demonstrates that the trial court's findings are clearly erroneous. However, if neither the facts nor the credibility of witnesses is challenged, the propriety of the trial court's determination is a legal one, and the reviewing court may consider the issue *de novo*. (*People v. Foskey* (1990), 136 Ill. 2d 66, 76, 554 N.E.2d 192, 197.) In this case, the determination of the propriety of the trial court's ruling hinges on the facts, which were to some extent disputed, and the credibility of the witnesses. Therefore, the question to be decided on review is whether the State has demonstrated that the findings of the trial court are clearly erroneous. We affirm.

The first witness called to testify by defendant was Sergeant Randy Weigler of the City of Jacksonville, Illinois, police department. Weigler was called as an adverse witness.

Weigler was on patrol on November 3, 1991. At about 2:30 a.m., he drove by Barney's Tavern, observed some vehicles there, and stopped to check it. He radioed for assistance, and several officers arrived, including Officer Tapscott. Weigler observed defendant leaving the tavern and told defendant to stop and return. Defendant stopped and looked right at Weigler, who motioned for defendant to come back to him. Weigler then proceeded to stop the other tavern patrons from leaving and directed them to return to the premises. About 20 minutes later, Tapscott informed Weigler that defendant had left the scene. Tapscott had obtained the defendant's license plate number, and further investigation established that defendant was residing at the High School apartments. A person at the station had indicated he knew defendant to be a student at Illinois College and where he resided.

Around 3 a.m., Weigler left the tavern and met with other officers, one of whom informed Weigler that defendant had fled from him. Weigler, Tapscott and Brett Taylor, a student riding with Tapscott, proceeded to the High School apartments. There, the manager, Lester Oettle, advised the officers that defendant lived in apartment 1-F. Oettle also advised the officers that another person named Mike Lovell was also possibly present in the apartment. Defendant and Lovell lived in the apartment. Defendant's motor vehicle had been observed in the parking lot. The High School apartments were a secured complex, and Oettle let the police officers in.

The officers went to apartment 1-F. They did not have an arrest warrant or a search warrant. As they were standing outside the apartment door, Weigler heard what he thought were three or four voices and music. His written report indicated he could hear two people talking and possibly a third. When they knocked on the door, the officers did not announce who they were. Weigler also put his finger over the peephole in the door so that a person inside the apartment could not see who was standing outside the door. The door opens outward into the hall. Defendant opened the door. Weigler testified he asked, "mind my coming in?" Defendant did not give a verbal response, but stepped back. As he stepped back, Weigler, Tapscott, and Taylor entered the apartment.

Within a few minutes after the officers entered the apartment, defendant was arrested for being in a tavern after closing hours, an ordinance violation, and fleeing the officers. After he was handcuffed with his hands behind his back, defendant was placed on the floor of the apartment near the entrance to the apartment. Weigler's report indicated he smelled cannabis as he stood outside in the hallway. Be-

fore placing defendant under arrest, the officer inquired why defendant fled and asked if he was Steve Bosse. Weigler stated he recognized defendant as soon as he opened the door. There were two other persons present in the living room of the apartment. The officers did not read defendant his *Miranda* rights at any time while in the apartment.

After securing defendant, in order to ensure the officers' safety, Weigler went to talk to the two other persons in the apartment. Weigler observed defendant to be excited and agitated and he felt there could be a fight. Defendant made no threats. As they entered the apartment, the officers did not know whether defendant was armed. Even after defendant was secured, they had reason to believe defendant was a danger to them. Weigler denied going into the living room to look around and moving some papers on the coffee table to discover what appeared to be a pipe and other drug paraphernalia underneath. The two persons in the living room, a male and female, were quickly patted down and no weapons were discovered. Prior to knocking on the door, Weigler had no reason to believe the occupants of the apartment, including defendant, suspected the officers were in the hall. The officers learned that there was only one entrance to the apartment. No threats or threatening gestures were made. The occupants of the apartment were informed that the rest of the apartment would be checked for the officers' safety. Weigler testified the officers had reason to believe there were other occupants because none of the three he had already spoken to were Lovell. Weigler admitted he had already asked if there was anyone else there and defendant stated there was no one else. Weigler proceeded to go through two bedrooms, a bathroom, and the living room closet. First he proceeded into the bedroom on the left. The lights were already on. He discovered no other person there. He checked the closet. In that room, he observed a plastic bag containing what appeared to be cannabis on a nightstand at the entrance of the room. He did not pick the bag up or open it. He then checked the other bedroom across the hall and the closet there. No other person was discovered there. Weigler then proceeded to the bathroom, where he observed a large "bong," a pipe, still smoking. He picked it up and put it on the sink. He determined, from his experience, that it contained cannabis. Before Weigler went into the bedrooms and bathroom to check for the officers' safety, he did not ask defendant for his consent. After Weigler walked back into the living room area, he advised defendant he was under arrest for possession of cannabis. He did not read defendant his *Miranda* rights. Weigler did telephone an assistant State's Attorney to inquire about

getting a warrant. The assistant State's Attorney told Weigler to first see if defendant would give permission. After the telephone conversation, Weigler went to defendant and told him he did not have to consent to the search, that they were going to get a search warrant and bring in a dog to search the residence and that he was under arrest for possession of cannabis. Defendant said they did not need to get a search warrant, that he would give them permission and he would show them where it was. At that time, defendant was still sitting on the floor with his hands handcuffed behind him. The officers had arrived at the apartment at 3:15 a.m. and defendant was placed under arrest for possession at about 3:31 a.m. After defendant gave his permission to search, Weigler, Tapscott, and defendant walked down the hallway of the apartment to what Weigler understood to be defendant's bedroom, wherein defendant indicated the cannabis was in the top drawer of the dresser. Weigler opened the drawer and discovered cannabis in clear plastic bags, money, checks, and syringes. The syringes were discovered in a white cardboard box inside the drawer. Defendant was then taken to jail.

Weigler was asked why, if he discovered the syringes then, did he later call to have a drug task-force officer inquire of defendant about the syringes and what they were for. Weigler explained that he discovered the syringes at this time, but the subject did arise later. While in the bedroom with defendant Weigler also picked up the bag on the nightstand and examined it. The officers did not search the bedroom at that time.

After defendant was removed from the apartment, Weigler again had a conversation with the assistant State's Attorney. The other two persons in the apartment were released and were not arrested. Tapscott was sent to get a video camera, and after the assistant State's Attorney arrived with a search warrant, video-tapes were made inside the apartment.

When he first arrived in the apartment and went back to talk to the two people, identified as the Woodwards, Weigler noticed seeds all over the table and the ashtray was pretty well exposed. "It wasn't completely covered up. You could see a brown, it was like, I just call it a one-hitter." This coffee table was only about 15 to 20 feet from the entrance to the apartment.

Defendant was removed from the apartment about 4 a.m. The warrant was obtained from Judge Bone about 6:30 a.m. Weigler went with the assistant State's Attorney to get the warrant. Weigler told the judge he had seen some seeds and other material on the coffee table. He thought he told the judge he observed cannabis on the

nightstand and a smoking pipe apparatus in the bathroom. He believed he also told the judge what he observed after he opened the door. He thought he probably told the judge about the inquiry made to the drug task-force officer about the syringes. Weigler was not really sure about this. He was the only one of the officers to testify before Judge Bone. The judge issued the warrant, and Weigler went back to the apartment to execute the warrant. Nothing was seized until they returned with the warrant. At that time, they removed the syringes, the plastic bags of cannabis, and the pipe from the bathroom, and gathered whatever could be found on the coffee table in the living room. They also removed a container with what was believed to be some form of steroids from defendant's room. It had defendant's name printed on it. It was discovered in the drawer of the nightstand. They also seized some cash, a list of names, a scale, and a camera which was hidden in the trash can in the bathroom. The film was later developed. The search warrant did not include cameras. The camera was seized because it appeared to have been hidden and have evidence pertaining to the case. The scale was found in a gym bag in the large living room closet. Photographs and videotapes were taken at that time.

On redirect examination, Weigler stated he observed a strong odor of cannabis emanating from apartment 1-F while the officers were standing in the hallway of the apartment building outside the apartment door. Defendant seemed very nervous and surprised. After handcuffing defendant, he observed the cannabis seeds and "one-hitter" pipe on the table. This was in plain view. When the defendant opened the door of the apartment, Weigler smelled a strong odor of burning cannabis. Looking into the doorway, he observed other people "standing up and moving around, shuffling things around the coffee table." It appeared that they were attempting to hide something. These people were later identified as Mike and Monica Woodward. He felt at that time that there might still be someone else in the apartment. He had arrested persons for drug offenses before and found them to be armed.

When Weigler asked for consent to search the rest of the apartment, defendant said he had some cannabis in the bedroom and he would show them where it was. He said he was the captain of the football team and tried to stay clean during the season. Nothing was seized until after the photographs were taken. All items were seized pursuant to the search warrant. Weigler identified as an exhibit his affidavit for search warrant to which he swore and which he signed before Judge Bone.

On re-cross-examination, Weigler stated he and Tapscott were in uniform on the night in question. The student rider was not. The cannabis seeds he observed on the table were just scattered seeds. They were greenish brown and looked like cannabis seeds to him. There was a pipe in the ashtray. He believed he picked it up and smelled it. He did not have to move anything to see that pipe. There were some magazines on it, but he could still see it. Weigler admitted that he wrote in his report, "[W]hile talking with the Woodwards I could see several cannabis seeds on the top of the coffee table; I then moved the magazines off of an ashtray which had a small one-hitter cannabis pipe inside it."

In the affidavit for search warrant, Weigler did not indicate he could smell cannabis while he was standing outside the apartment door. The affidavit stated, "Once in apartment 1-F I smelled an odor of cannabis."

The 23-year-old defendant was the next witness to testify. Defendant admitted he resided at the apartment in question and Lovell was his roommate. Lovell, however, was in Ohio at the time of the incident. When defendant answered the knock on the door, he thought it might be a friend from down the hall. This was a secured apartment building. To access the hallway, a person would have to have a key or be let in by a resident. Defendant attempted to use the peephole, but could not see through it. The door of the apartment opened into the hallway. Defendant opened the door about three inches to see who was at the door. He observed three persons. Two were uniformed police officers. He was asked if he was Steve Bosse. He said he was. Defendant was then arrested for fleeing police. Defendant stated none of the three said anything to him about coming in. When he opened the door and saw the officers, he was startled and stepped back. The officers opened the door. He believed it was Weigler who opened the door because he was in front of the others. As Weigler opened the door, defendant took one step back and stopped. As he opened the door, Weigler told defendant he was under arrest. The other two persons followed Weigler into the apartment. Defendant and the two persons on the couch were all frisked. Defendant was cuffed with his hands behind him and placed in a sitting position on the floor about six feet from the doorway and against the wall. Weigler then walked around the apartment. Defendant was about 12 feet from the coffee table and defendant saw Weigler go over to the coffee table and move things around on the coffee table. Weigler walked down the apartment hallway. He did not say anything to defendant before he did that. None of the officers gave him his *Miranda* rights. When Weigler

returned, he told defendant he was under arrest for possession of cannabis. After Weigler got off the telephone, he asked defendant to give consent to a search. Weigler explained that means "you give us permission to look throughout the house, because if you don't we will bring in a canine dog and they'll find everything." Defendant said he would show them where it was. Defendant said he gave his consent because he had never been arrested before, he was on the floor, Weigler is a rather large person, and he said he was going to bring in the dogs and "I had no idea what that means, but I didn't want any part of it." Weigler was a police officer, and defendant thought he had to show them where it was. Defendant went back into the bedroom with them and told them it was in the top dresser drawer. Weigler opened the drawer, but did not touch anything in it. Weigler asked if this was all of it and whether there was any "coke" or anything, and defendant said, "no, sir, that's it." Weigler did not open the white box at that time. Defendant was then transported to the police station. Later, while in conference with Detective Lael, Lael received a telephone call and then inquired of defendant about the syringes that were found. Lael told defendant the officers were angry. They felt defendant had lied to them because they found the syringes.

Joe Tapscott testified he smelled burning cannabis while outside the apartment door. Weigler knocked on the door and defendant answered. Weigler asked defendant if he were Steven Bosse. Defendant responded he was. Weigler then asked why he ran from Barney's and defendant said the bartender told him to leave. Weigler then said the officers needed to speak to him and asked if defendant would mind if they came in. Defendant made no response, but opened the door. Neither Weigler nor Tapscott opened the door. Tapscott's testimony as to what happened confirmed Weigler's testimony. Tapscott observed the rolls of cannabis, cash, checks, and two syringes in the dresser drawer.

On cross-examination, Tapscott indicated he had just completed his second year on the force. They smelled the odor of cannabis in the hallway. They did not sniff at the bottom of the door to determine if it was emanating from there. There were other apartment entrances onto the hallway. Weigler knocked on the door. No one announced that it was the police at the door, and Weigler put his thumb over the peephole. When defendant opened the door, Tapscott and the student rider were standing to Weigler's left. Tapscott was standing away from the opening of the door. The conversation took place while the door was open. Weigler asked defendant why he left. Defendant said the bartender told him to leave. The officers told defendant they had

ordered him to remain there. Then Weigler asked if they could come in. The door opened, and they entered. Defendant was backing up as they came in.

Tapscott admitted his report stated only that, after defendant opened the door, Weigler advised defendant they needed to talk and he allowed them in. None of the other conversation to which he testified was in the report. In the written report, Tapscott stated, "Once inside, Sergeant Weigler asked Steve Bosse why he left Barney's Pub when he was told by both of us to remain." Tapscott testified this conversation took place both in the hallway and in the apartment. As a matter of clarification, the court asked, "The door came open, walked in, and your words were that Officer Weigler placed him under arrest?" To this question the witness responded, "Yes. Yes, sir."

Brett Taylor was riding with Tapscott on the night of the incident. He was a 20-year-old student at MacMurray College. While outside the apartment, he observed an odor, but he was not exactly sure what it was. He heard voices inside the apartment. Weigler knocked and put his thumb over the peephole. Defendant opened the door. Weigler asked if they could talk to him and defendant stepped back and let them in. Then Weigler asked why defendant fled. Defendant appeared scared, agitated, and tense. The defendant was then cuffed and asked to sit on the floor. No force was involved in the entry of the apartment. Defendant opened the door to the apartment. On cross-examination, Taylor said he thought the stepping back by defendant was an indication of permission to enter. He believed defendant said they could enter, but he did not remember the defendant's exact words. Taylor testified that when Weigler asked defendant if he minded if they speak to him, defendant said okay, and then stepped back. It was inside the apartment that Weigler asked defendant why he left Barney's.

Weigler was then recalled as a witness by the State. He stated that when he asked permission to enter, the defendant opened the door.

In an attempt to overturn the suppression order, the State raises two contentions on appeal, to wit: (1) defendant consented to the officers' entry into his apartment, and (2) Weigler's protective sweep of the apartment was constitutionally permissible under *Maryland v. Buie* (1990), 494 U.S. 325, 108 L. Ed. 2d 276, 110 S. Ct. 1093. We do not reach the second contention since the trial court's finding that the defendant did not consent to the officers' entry into his apartment was not clearly erroneous. No argument is made by the State that exigent circumstances existed which justified a nonconsensual entry.

■ Even a suspect who flees to his own residence to escape capture has not forfeited his right to be free from warrantless arrest in his home. (*People v. White* (1987), 117 Ill. 2d 194, 214-15, 512 N.E.2d 677, 684.) The fourth amendment to the United States Constitution (U.S. Const., amend. IV) prohibits warrantless, nonconsensual arrests in the home in the absence of exigent circumstances. (*People v. Henderson* (1990), 142 Ill. 2d 258, 298, 568 N.E.2d 1234, 1253.) In *People v. Bean* (1981), 84 Ill. 2d 64, 69, 417 N.E.2d 608, 611, the Illinois Supreme Court stated the following:

> "We agree that generally an arrest warrant is the desired means by which an individual's right to privacy is protected. (*Payton v. New York* (1980), 445 U.S. 573, 590, 63 L. Ed. 2d 639, 653, 100 S. Ct. 1371, 1381-82; *McDonald v. United States* (1948), 335 U.S. 451, 453, 93 L. Ed. 153, 157, 69 S. Ct. 191, 192.) However, when voluntary consent is given to enter one's residence and an arrest is effected based on probable cause, the suspect's rights under the fourth amendment are not violated, even in the absence of exigent circumstances. The standard for valid consent applied by the Supreme Court in a variety of circumstances is whether that consent is voluntarily given. (*Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 248-49, 36 L. Ed. 2d 854, 875, 93 S. Ct. 2041, 2058-59; *Bumper v. North Carolina* (1968), 391 U.S. 543, 548, 20 L. Ed. 2d 797, 802, 88 S. Ct. 1788, 1791. See *Johnson v. United States* (1948), 333 U.S. 10, 13, 92 L. Ed. 436, 440, 68 S. Ct. 367, 368-69.)"

In *Bean*, the *Payton* and *Bumper* cases were distinguished, *Payton* involving entry by force (crowbars used to break down a door) and *Bumper* involving entry by deceit (the homeowner was told the officers had a search warrant which was not displayed). *Bean*, 84 Ill. 2d at 70, 417 N.E.2d at 611.

In *Henderson* (142 Ill. 2d at 298-99, 568 N.E.2d at 1253-54), the Illinois Supreme Court explained:

> "[w]hat words or conduct constitute consent to enter a home has never been explicated by the Supreme Court. (But see *Bumper*, 391 U.S. 543, 20 L. Ed. 2d 797, 88 S. Ct. 1788 (defendant's grandmother's allowing police to enter after they falsely claimed to have a search warrant was not voluntary consent, but the product of coercion).) Although the lower courts generally agree that consent to enter a residence validates a warrantless arrest (2 W. LaFave, Search & Seizure §6.1(c), at 582 (2d ed. 1987) (and cases cited)), there is little authority as to what constitutes consent in the absence of an express verbal

statement. But see *United States v. Briley* (8th Cir. 1984), 726 F.2d 1301 (valid consent was given when defendant's girlfriend told police officers defendant was in her apartment and they should come with her, and girlfriend then opened apartment door wide and gestured toward defendant, who was standing in the apartment; police entered and arrested defendant); *State v. Blair* (Mo. 1982), 638 S.W.2d 739 (consent given by woman's opening apartment door in response to police officer's knock, and, after officer asked if defendant was there, opening door wide and stepping back; officer then walked to back of apartment and arrested defendant).

This court has held that a warrantless arrest in the home is rendered valid when the police are given voluntary consent by a defendant or a third party who has control over the premises. (Compare *People v. Bean* (1981), 84 Ill. 2d 64, 69-70 (defendant's mother expressly invited police to enter and they did not need to get consent to advance past threshold and enter another room), with *People v. White* (1987), 117 Ill. 2d 194, 221 (no consent when police pushed past man who opened front door without requesting his permission to enter).) But this court has not decided what standard the alleged consent has to meet or whether the consent needs to be unequivocal and specific. We now hold that, when a court is deciding whether consent was given (not whether that consent was voluntary), the circumstances must have been such that the police could have reasonably believed they had been given consent to enter."

In *Henderson*, the trial court found the officers had consent to enter the apartment and the supreme court affirmed that finding, even though defendant's mother testified, contrary to the police officers, that she did not give consent and the officers just rushed in and asked for defendant. *Henderson*, 142 Ill. 2d at 294-300, 568 N.E.2d at 1251-54.

Defendant relies on the Illinois Supreme Court decision in *White*, which upheld the trial court's determination that no voluntary consent was given for the police to enter. In *White*, in spite of officers' testimony that they were "permitted" into the apartment, the court found the door was opened for another person and that the person opening the door did not know the police were waiting to push past her. *White*, 117 Ill. 2d at 221, 512 N.E.2d at 687.

■ We have reviewed the facts of this case very thoroughly. While we may not have decided the matter as the trial court did, it is

clear that the trial court's decision rests on a determination of witness credibility. The trial court found defendant more credible.

Here, the officers, knowing where defendant lived, went there for the purpose of arresting him for two relatively minor offenses. The officers had no arrest or search warrant and entered a secured building with the assistance of the manager. Proceeding to the door of defendant's apartment, the officers knocked on the door, did not announce their office, and covered the peephole in the door so as to require any occupant to open the door in order to observe who was standing outside. Defendant opened the door of the apartment, which opened outward into the hall of the apartment building, about three inches.

The trial court could reasonably find that the police never intended to wait for a verbal consent to enter the apartment from defendant, but entered the apartment on any movement which could arguably be interpreted to be consent. The test for determining whether the officers understood consent to enter was given is not merely movement, but movement which reasonably conveys a message. In *Henderson,* it was opening the door and pointing the way. Merely because a person answering the door takes a step backward upon seeing the police does not, in the absence of other motions or gestures, provide the police with the reasonable belief that consent to enter was given. The suppression of the evidence was not clearly erroneous.

For the foregoing reasons, the judgment of the circuit court of Morgan County was affirmed.

Affirmed.

KNECHT and COOK, JJ., concur.