THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTHONY PARKER, Defendant-Appellant.

First District (2nd Division)   No. 1—96—2050

Opinion filed March 28, 2000.

608

Scott D. Sherwin, of Chicago (Daniel J. Florey, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Janet C. Mahoney, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McBRIDE delivered the opinion of the court:

Defendant was charged and convicted of the murder of Ernest Jackson and the attempted murder of Thadeus Turner. The trial court sentenced defendant to concurrent terms of 50 years' imprisonment for Jackson's murder and 15 years for the attempted murder of Turner. On appeal, defendant argues that: (1) he had standing to contest the search and seizure occurring within his mother's home; (2) the search and seizure were unreasonable; (3) the impaneling of a hearing-impaired juror denied him the right to a fair trial; (4) the prosecutor's failure to disclose information regarding the past relationship between a prosecution witness and defendant was a discovery violation that denied him a fair trial; (5) the prosecution's failure to disclose defendant's statements to police at the time of his arrest was a discovery violation that denied him a fair trial; and (6) he was denied a fair trial by the prosecutor's improper and repeated inflammatory remarks during closing argument. Because we find the trial court erred in its determination that defendant lacked standing to contest the search and seizure of his mother's home and erred in determining that defendant consented to this search, we will limit our discussion to the pertinent facts and law surrounding those two issues.

At the pretrial motions hearing defendant testified that on September 22, 1993, at approximately 10 p.m., police arrived at his mother's home located at 10106 South Green. Defendant said he lived at that address with his mother, two sisters and a brother. According to defendant, he answered the front door to find two plainclothes officers and several uniformed police officers standing outside. The police immediately grabbed him, placed him in handcuffs and made him sit on the couch in the front room. Defendant also testified that the police conducted a search that lasted about 20 minutes. Police then escorted defendant to the station. Defendant testified that the officers did not have a search warrant or ask him or his mother for consent to enter or search the home.

The prosecution then called Officer Clarence Keith, who testified that on the night of Jackson's murder he spoke with two witnesses, Leandre Cooper and Thadeus Turner. After interviewing Cooper and Turner, Keith had defendant's name, physical description, and the make and model of his car. In an effort to locate defendant, Keith and

his partner went to the home of defendant's grandmother. Although defendant was not present, his grandmother confirmed that she owned the car that was observed by Cooper fleeing the scene on the night of the shooting. The following day police returned to the home of defendant's grandmother and still were unable to find defendant. Defendant's grandmother told Keith that defendant had been living with her at 8114 South Manistee. As the police officers left that address, they were approached by residents of the neighborhood who informed them that defendant could be found hiding at his mother's home, located at 10106 South Green.

Based on that information police went to the home of defendant's mother. Officer Keith and another officer positioned themselves at the rear of the house while Officer Annise Fuller, her partner and Sergeant Penya were stationed near the front. Officer Keith testified that Officer Fuller attempted to call inside to the Parker home from a cellular phone. After two unsuccessful attempts to call inside, Keith stated that the lights in the house were turned off. Keith then "heard some type of noise coming from inside the house." As a result, Keith approached the house, knocked on the rear window and announced that he was a police officer. Keith then heard noise coming from the front of the house. When Keith arrived at the front of the house, he saw Sergeant Penya placing handcuffs on Parker. Keith testified defendant was wearing a "T shirt" and some pants but he was not wearing a hat, shoes, or a coat. During defendant's suppression hearing the following exchange occurred:

"Q. Now, subsequent to this, you were going to transport the defendant to Area 2, correct?

A. Yes.

Q. Before doing so, what if anything did you do concerning the fact he had—no—know [*sic*] shoes on?

A. Well it was kind of cold outside, little chilly outside and I believe he wanted to get some clothing to cover his body.

Q. So then did you enter the premises at that time?

A. Yes.

\* \* \*

Q. Now, at that point, did anybody go with the defendant to get him some shoes and a jacket?

A. Yes.

Q. And who was that?

A. I believe that was Officer Fuller and another one of the officers that was there at the scene."

Officer Annise Fuller testified that on September 22, 1993, she was attempting to locate Anthony Parker with Officers O'Connell, Keith and Wilson. She, Officer O'Connell, and Sergeant Penya went to

the home located at 10106 South Green and situated themselves at the front of the house. Officer Fuller stated that after she made two unsuccessful phone calls to the Parker home the lights in the house went out. According to Fuller, defendant then ran outside from the front of the house. He was apprehended by Sergeant Penya and Fuller about five or six feet from the front door. Fuller observed that defendant had on dark clothing but was not wearing any shoes or socks. Fuller also testified that she and either Officer O'Connell or Keith entered the premises to get clothing for defendant in order to transport him to the police station.

Upon entering the home Officer Fuller went into a bedroom and seized a "Cincinnati Reds" jacket, a pullover and a pair of red pants. These events were recounted by Officer Fuller on direct examination:

"Q. And when you entered the premises, could you tell us who if any one went back—went to a room with the defendant?

A. I went and I think—I think it was Officer Keith, it was either Officer Keith or Officer O'Connell who went in the back with me.

Q. Did the defendant direct you to a certain room he had had clothing?

A. Yes. I asked him where, I asked him where were his things.

Q. And he directed you to a room in the back?

A. Yes.

* * *

Q. Okay. When you went back into that room with the defendant, Parker, to get a pair of shoes for him, did you notice anything unusual in that room.

A. Yes.

Q. What did you notice.

A. The black jacket with Cincinnati Reds writing, the pullover and red pants.

Q. And did you get—did you take those items?

A. Yes, I did."

Fuller also testified that defendant listed 8114 South Manistee as his address when he was processed at Area 2 headquarters. No other police testimony was presented by the prosecution on the issue of consent at the pretrial hearing. After hearing this testimony the trial court denied the defendant's motion to suppress and found:

"As to going into the home, based on both things, based on the fact that the defendant wanted them to go back in and get his shoes which was the testimony of Officer Keith and also based on the testimony—strike that. Based on the fact that the Court is going to find at this time that the defendant did not live 10106 South Green, the defendant lived with his grandmother, that's a finding of facts [sic] that the Court is going to make at this time, so the de-

fendant—the Court believes he does not have standing to attack the search of the home if in fact there was a search. That is based on standing alone and also on the fact that he did want someone to get his shoes."

■ Generally, a reviewing court will not disturb the trial court's finding on a motion to suppress unless that finding is manifestly erroneous. *People v. Turnipseed*, 274 Ill. App. 3d 527, 530, 653 N.E.2d 1258 (1995). However, the question of whether or not a defendant has standing to contest an allegedly unlawful search or seizure is a question of law. *People v. Bower*, 291 Ill. App. 3d 1077, 1079, 685 N.E.2d 393 (1997). Therefore, with respect to the issue of standing, this court reviews the trial court's decision *de novo. Bower*, 291 Ill. App. 3d at 1079.

Preliminarily, we note that although the prosecution does not concede the issue of standing, it does maintain that the issue is irrelevant because the trial court also denied defendant's motion to suppress based upon defendant's consent to police entry. Nevertheless, we choose to review the issue of standing, since it is unclear from the record upon which basis the trial court relied in denying defendant's motion to suppress:

"[T]he Court believes [defendant] does not have standing to attack the search of the home if in fact there was a search. That is based on standing alone and also on the fact that he did want someone to get his shoes."

■ In order for a defendant to have standing to contest a search and seizure, he must demonstrate "an affront to his personal fourth amendment rights." *People v. Brown*, 277 Ill. App. 3d 989, 994, 661 N.E.2d 533 (1996). The fourth amendment guarantees:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV.

*Minnesota v. Carter*, 525 U.S. 83, 88, 142 L. Ed. 2d 373, 379, 119 S. Ct. 469, 473 (1998).

Because the fourth amendment safeguards individuals from unreasonable searches of both their "persons" and their "houses," the fourth amendment's protection is a personal right to be invoked by the person. *Carter*, 525 U.S. at 88, 142 L. Ed. 2d at 379, 119 S. Ct. at 473. The extent to which this amendment may protect the person, however, will in large part depend on who this person is and his relationship to the area searched. *Carter*, 525 U.S. at 88, 142 L. Ed. 2d at

379, 119 S. Ct. at 473. Therefore, the " 'capacity to claim the protection of the Fourth Amendment depends...upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place.' " *Carter*, 525 U.S. at 88, 142 L. Ed. 2d at 379, 119 S. Ct. at 473, quoting *Rakas v. Illinois*, 439 U.S. 128, 143, 58 L. Ed. 2d 387, 401, 99 S. Ct. 421, 430 (1978); see *People v. Kidd*, 178 Ill. 2d 92, 135, 687 N.E.2d 945 (1997) (the "fourth amendment protection depends, not upon a property right, but upon whether the aggrieved person has a legitimate expectation of privacy in the place invaded"). Thus, the question now becomes whether defendant in the instant case demonstrated a reasonable expectation of privacy in either the area searched or the items seized. See *Brown*, 277 Ill. App. 3d at 994 (a defendant is without standing to seek suppression of items seized from a residence where he does not reside unless he proves that he possessed a legitimate expectation of privacy in the areas searched or in the property seized). Whether a defendant has demonstrated a reasonable expectation of privacy in the area searched or in the items seized must be determined in light of the totality of the circumstances of the particular case. *Kidd*, 178 Ill. 2d at 136.

In *People v. Johnson*, 114 Ill. 2d 170, 191-92, 499 N.E.2d 1355 (1986), our supreme court enunciated several factors that should be examined in order to determine whether a defendant possesses a reasonable expectation of privacy such as: (1) ownership of the property searched; (2) whether the defendant was legitimately present in the area searched; (3) whether defendant has a possessory interest in the area or property seized; (4) prior use of the area searched or property seized; (5) the ability to control or exclude others from the use of the property; and (6) whether the defendant himself had a subjective expectation of privacy in the property. Additionally, in Illinois the storage of personal effects and other indicia of residence have been found to confer standing on nonovernight guests. See *People v. Alexander*, 272 Ill. App. 3d 698, 703, 650 N.E.2d 1038 (1995).

In the instant case, even if we were to accept only the prosecution's view of the evidence, as the trial court did, when we apply the factors set forth in *Johnson*, we find defendant possessed a reasonable expectation of privacy in his mother's home and in the items seized and, thus, maintained standing to contest its search. It is clear that at the time of his arrest defendant had just been inside his mother's home and that defendant's clothes, including the specific pieces of clothing seized by the officers, were retrieved from a bedroom in that home. Officer Fuller testified that defendant's socks and shoes were also recovered from this same room.

Applying these facts to the first factor enunciated in *Johnson*,

there is no question that defendant possessed an ownership interest in his own clothes. Moreover, the fact that defendant kept personal effects in a bedroom at his mother's home demonstrates not only that defendant was legitimately present in his mother's home that night but that he had a possessory interest in the clothes seized from this location. Further, based upon the presence of his clothes, shoes and socks in the bedroom, it is also clear that defendant had been using this bedroom sometime prior to the search. Because this was defendant's mother's home and because defendant had used this bedroom, it is also fair to conclude that defendant possessed the ability to control or exclude others from the use of his personal belongings found there. Finally, there was the stipulated testimony by defendant's mother that defendant lived with her in her home. When this testimony is combined with defendant's own testimony and the foregoing facts, we find there to be little doubt that defendant maintained a subjective expectation of privacy in the property seized from his mother's home.

Although defendant's suppression hearing produced testimony that raised questions as to his permanent residence, we do not believe this fact alone should have controlled the trial court's decision on whether or not defendant had standing. In its finding, the trial court concluded that because defendant lived at his grandmother's home he lacked standing to challenge the search and seizure at his mother's home. This analysis did not go far enough, however, since permanent residence elsewhere does not foreclose further consideration of whether a defendant has standing to contest the constitutional validity of a search or seizure. For example, it is well established that an overnight guest in a home enjoys a reasonable expectation of privacy and, thus, may claim the protection of the fourth amendment. *Minnesota v. Olson*, 495 U.S. 91, 98, 109 L. Ed. 2d 85, 94, 110 S. Ct. 1684, 1689 (1990) (status of being an overnight guest is alone enough to show that an individual maintains an expectation of privacy in the host's home that society is prepared to recognize as reasonable). Conversely, one who is merely present or visiting with the consent of the householder may not. *People v. Ervin*, 269 Ill. App. 3d 141, 146-47, 645 N.E.2d 355 (1994) (overnight guests in private homes have a sufficiently legitimate expectation of privacy in the premises to confer standing to challenge a search, but persons who are guests or merely present in someone else's home or on another person's property will not be conferred standing). In some instances, however, a reasonable expectation of privacy may be found to exist for those who are neither permanent residents of a home nor overnight guests. See *Alexander*, 272 Ill. App. 3d at 703-04 (defendant enjoyed reasonable expectation

of privacy and thus had standing to contest the search of his sister's garage where he regularly used the garage, exercised ownership over several of the items in it and was or had been seen operating a business from property on which the garage was located).

It is undisputed that defendant was arrested in the evening hours at about 10 p.m., that he was partially dressed, that the clothing seized was found in one of the bedrooms, and that the location of the arrest was his mother's home. The prosecution also presented testimony that police went to defendant's grandmother's home in search of defendant. Police did not initially find defendant there but returned the very next day. Once again, the police were unable to locate defendant; however, they were told by neighbors of defendant's grandmother that defendant could be found hiding at his mother's home. Acting upon this information, police did in fact locate defendant at his mother's home. These facts notwithstanding, both defendant and his mother offered testimony that defendant lived at his mother's home. When these facts are viewed in their totality, we find they support the conclusion that defendant either resided permanently, temporarily or at very least was an overnight guest in his mother's home. When applied to the facts of this particular case, any of the above findings would allow defendant a reasonable expectation of privacy in the property seized in his mother's home and give him standing to contest its search. See *Olson*, 495 U.S. at 98, 109 L. Ed. 2d at 94, 110 S. Ct. at 1689 ("[t]o hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the everyday expectations of privacy that we all share"). Moreover, defendant's overnight guest status would not be incompatible with the trial court's initial finding that defendant permanently resided at his grandmother's home. Because it is well established that an overnight guest enjoys a reasonable expectation of privacy and because we conclude that, at a minimum, the evidence showed defendant was an overnight guest, defendant should have been afforded the opportunity to challenge the constitutional validity of the search occurring at his mother's home. As such, we find the trial court's denial of defendant's motion to suppress based upon a lack of standing to be manifestly erroneous and reverse its decision with respect to this issue.

■ Because we have determined that defendant had standing to challenge the search and seizure of his mother's home, we now examine whether or not that search was in fact reasonable. Unreasonable searches and seizures are prohibited under the fourth amendment of the United States Constitution (U.S. Const., amend. IV) and article I, section 6, of the Illinois Constitution (Ill. Const. 1970, art. I, § 6). A search that is conducted pursuant to consent is one of the specifically

established exceptions to the requirements of both a warrant and probable cause. *People v. Bruce*, 185 Ill. App. 3d 356, 368, 541 N.E.2d 708 (1989); *People v. Harris*, 297 Ill. App. 3d 1073, 1083, 697 N.E.2d 850 (1998); *People v. Phillips*, 264 Ill. App. 3d 213, 217, 636 N.E.2d 1118 (1994) (holding "[i]t is a well-settled proposition that an individual may consent to a search conducted without a warrant and thus eliminate the need for probable cause and a search warrant").

■ Although often considered one and the same question, the area of constitutionally valid consent is actually two issues. *Saaverdra v. State*, 622 So. 2d 952, 960 n.12 (Fla. 1993) (Barkett, C.J., specially concurring) (stating "[t]he consent question *** involves discrete but ofttimes overlapping" issues). First, it must be determined whether or not consent was given and then, second, whether or not that consent was in fact voluntary. See *Bruce*, 185 Ill. App. 3d at 368 ("[t]he trial court must determine as a factual matter whether the defendant has given his consent in the particular case"). The latter of these two inquiries has been the subject of countless judicial opinions; however, the former has received far less scrutiny.

Despite less analysis on this issue, courts have consistently recognized the distinction between whether consent was given and whether the consent was voluntary. See *People v. Taylor*, 245 Ill. App. 3d 602, 607, 614 N.E.2d 1272 (1993) (stating "here we are presented, as was the trial court, with the question of whether [defendant] consented to the search, not whether his alleged consent was voluntary"); *People v. Bosse*, 238 Ill. App. 3d 1008, 1017, 605 N.E.2d 593 (1992); *United States v. Price*, 54 F.3d 342, 345 (7th Cir. 1995) (characterizing the defendant's issue as "not so much whether [the defendant's] consent was voluntary but whether he consented at all"); *United States v. Walker*, 43 F. Supp. 2d 828, 835 (N.D. Ohio 1998) (considering whether consent was obtained at all and then whether such consent could be considered voluntary); *Saaverdra*, 622 So.2d at 960 n.12 (stating that "[p]roof that consent was given is a very different question from whether evidence supports a finding that consent, if given, was valid").

Although our supreme court in *People v. Henderson*, 142 Ill. 2d 258, 299, 568 N.E.2d 1234 (1990), held that "when a court is deciding whether consent was given (not whether that consent was voluntary), the circumstances must have been such that the police could have reasonably believed they had been given consent to enter," this standard still remains largely undefined. For example, whether consent must be unequivocal or specific before it is considered valid has yet to be decided. See *Henderson*, 142 Ill. 2d at 298 ("there is little authority as to what constitutes consent in the absence of an express verbal state-

ment"). In *Henderson*, our supreme court affirmed the trial court's finding of consent where police entered an apartment, identified themselves and asked if the defendant was home. Defendant's mother answered the door, confirmed that defendant was inside and stepped back from the open door and pointed toward defendant's bedroom. As demonstrated by *Henderson*, consent can be given in the form of either gestures or conduct as well as by the spoken word. *Henderson*, 142 Ill. 2d at 298-99; see also *People v. Gross*, 166 Ill. App. 3d 413, 423-24, 519 N.E.2d 1043 (1988) (defendant who opened apartment door for police and then sat at kitchen table during their conversation consented to police following him inside the apartment); see *United States v. Cotnam*, 88 F.3d 487 (7th Cir. 1996) (consent given where defendant gestured for officer to open the door to his hotel room with his key); *United States v. Rodriguez*, 931 F. Supp. 907, 917 (D. Mass. 1996) (objective manifestation of consent to warrantless search may include gesture such as stepping away after opening door).

In this particular case, the burden fell upon the prosecution to demonstrate that the officers actually obtained consent. Through his testimony defendant claimed that, when he opened the door, the police immediately grabbed him, restrained him with handcuffs, and put him on a couch in the front room. Defendant also testified that he had shoes on and was fully clothed when arrested inside his home. In stark contrast, the police officers testified defendant was arrested outside, partially unclothed, and they found it necessary to take him inside to get him shoes and socks.

The trial court based its finding of consent on its impression that "defendant wanted [police] to go back in and get his shoes which was the testimony of Officer Keith." In conjunction with this finding the prosecution argues that "[s]ince [defendant] was under arrest, defendant could not re-enter the house alone to retrieve his shoes or coat." The prosecution also contends:

> "At defendant's direction, defendant and two officers entered the residence and proceeded to the room in which defendant had his things. Clearly, defendant gave the officers consent to enter the residence and the room in which he kept his things so he could retrieve his coat and shoes."

This argument, however, is not supported by any actual testimony presented at defendant's suppression hearing. Neither Officer Keith nor Fuller ever testified that defendant gave them permission or consent to enter his mother's home. Although Officer Keith stated he believed defendant wanted to reenter his mother's home, he never said that he asked defendant whether he wanted to go back inside his mother's home. Nor did Keith testify that defendant actually asked

him to go back inside to get shoes and socks due to the cold temperature. Furthermore, Keith never testified to any words actually spoken by defendant about entry into his mother's home that night. The most Keith alluded to was that defendant "wanted to get some clothing to cover his body." The same can be said of Officer Fuller, who, in response to a question by the prosecutor, said the defendant "directed" her to a room where she subsequently seized the evidence sought to be suppressed. The trial court was therefore left to determine whether consent was given based upon the conclusions and impressions of two police officers without any competent testimony from those same officers that defendant gave his consent to police entry by either words, some type of conduct or even a gesture. Moreover, defendant specifically denied ever consenting to police entry into his mother's home and denied ever directing them to a room. We also observe that at trial Officer Fuller changed her testimony on how entry was made to the home as demonstrated by the following colloquy between Fuller and the assistant State's Attorney:

"Q. When you saw him, did you recognize him to be Anthony Parker?

A. Oh, yeah.

Q. He was then placed under arrest, correct?

A. Yes.

\* \* \*

Q. Okay. Now were you going to take him anywhere from that premises?

A. Yes, I was.

Q. Where were you going to take him?

A. We were going to take him to Area 2.

Q. Prior to doing that, what happened?

A. Well, he needed to have his shoes and jacket because it was cool that night. And we brought him back in the house.

\* \* \*

Q. ...[W]hat did you ask him concerning where he was staying?

A. I asked him where he had been staying in the house.

Q. Where did he say?

A. He told me in the back.

Q. Did he lead you anywhere at that point?

A. We went to the back, the back room.

Q. And once you got to that back room, did you and the defendant Parker enter that room?

A. Yes."

We recognize that, in determining whether or not consent was actually given, the trial court generally has the benefit of weighing conflicting testimony. See *Taylor*, 245 Ill. App. 3d at 607-08 (finding of

no consent after hearing both defendant's and officer's testimony surrounding the stop and search of defendant's car); *People v. Llanos*, 288 Ill. App. 3d 592, 681 N.E.2d 598 (1997) (two officers testified that, after arresting defendant in his kitchen for possession of a controlled substance, defendant was advised of his *Miranda* rights, placed in handcuffs, and given a written consent form which he read and signed, but defendant denied this version of the facts, and the trial court accorded more weight to the two officers); *People v. Carter*, 288 Ill. App. 3d 658, 665, 681 N.E.2d 541 (1997) (record showed that, when asked if officers could look inside defendant's suitcase, defendant answered " 'yes, if you must' "; however, officer retorted, " 'it's not that I must. That's why I am asking your permission to search,' " to which the defendant answered, " 'go ahead' "); *People v. Hernandez*, 278 Ill. App. 3d 545, 663 N.E.2d 86 (1996) (trial court's finding of consent was not clearly unreasonable after hearing testimony and the circumstances surrounding the consent from defendant and other defense witnesses, versus that of several police officers—enabled the trial court to make credibility determinations); see also *Phillips*, 264 Ill. App. 3d 213.

█ Where the evidence on an issue is in conflict, we will accept the trial court's finding unless that finding is clearly unreasonable. *Bruce*, 185 Ill. App. 3d at 368. In this case, however, the prosecution never presented any competent evidence that defendant actually gave consent to enter his mother's home by either words, conduct or gestures. In fact, Officer Fuller's testimony at trial suggests just the opposite when she stated that defendant "needed to have his shoes and jacket because it was cool that night. *And we brought him back in the house*." (Emphasis added.) Consequently, there was no conflicting evidence regarding the question of whether or not defendant actually gave consent. Furthermore, under *Henderson*, we do not find that the conclusory statements and impressions of the police officers are circumstances in which the "police could have reasonably believed they had been given consent to enter." *Henderson*, 142 Ill. 2d at 299. Rather, we find the trial court was without any factual basis from which it could conclude that police had been given consent to enter. As a result, we hold its decision denying the motion to quash and suppress evidence was manifestly erroneous. We reverse its ruling and remand this matter for a new trial without the evidence improperly seized. Because we are remanding this case for a new trial, the other claimed errors need not be considered.

Reversed and remanded.

COUSINS, P.J., and GORDON, J., concur.