# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*People v. Nichols*, 2012 IL App (2d) 100028

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RICKIE T. NICHOLS, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-10-0028 |
| Filed | January 18, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for two counts of aggravated criminal sexual assault were upheld over his contentions that the trial court erred in denying his motion to quash his arrest and suppress items seized from a shed at codefendant's residence and that his sentence violated due process and the proportionate penalties clause, since the finding that defendant kept items of his in the shed while visiting codefendant was not against the manifest weight of the evidence, but there was no evidence defendant had an expectation of privacy in the shed and, therefore, he lacked standing to challenge the search of the shed and the seizure of the items found there, and further, defendant's sentence did not violate the constitutional requirement of proportionality, and the case presented the particular evil mandatory consecutive sentencing was meant to address. |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 08-CF-3797; the Hon. George Bridges, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal     Mark A. Flessner, Geoffrey Repo, and Kristen C. Rodriguez, all of SNR Denton US LLP, of Chicago, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (Lawrence M. Bauer and David A. Bernhard, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel     JUSTICE BIRKETT delivered the judgment of the court, with opinion.

Justices Hutchinson and Zenoff concurred in the judgment and opinion.

## OPINION

¶ 1     Following a September 2009 jury trial, defendant, Rickie T. Nichols, was convicted of two counts of aggravated criminal sexual assault and sentenced to the statutory minimum of 32 years in prison. On appeal, defendant argues that (1) the trial court erred in denying his motion to quash his arrest and suppress items seized from a shed located at the home of defendant's friend and codefendant, Stephen Knighten; and (2) his 32-year sentence violates both the proportionate penalties and the due process clauses of the Illinois Constitution. For the following reasons, we affirm.

¶ 2                    I. BACKGROUND

¶ 3     In October 2008, defendant and Stephen Knighten were charged in a four-count indictment for their attack on the victim, K.H., which occurred on September 9, 2008, in Zion. Counts I and II charged aggravated criminal sexual assault (720 ILCS 5/12-14(a)(1) (West 2008)), and counts III and IV charged criminal sexual assault (720 ILCS 5/12-13(a)(1) (West 2008)). Counts II and IV charged defendant for Knighten's actions, under an accountability theory. See 720 ILCS 5/5-2 (West 2008). Defendant, who was born on April 13, 1992, was under 17 years of age when the assault occurred, and hence normally would have been subject to proceedings under the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2008)). Because he was over 15 years of age and was charged with aggravated criminal sexual assault, however, the automatic transfer statute (705 ILCS 405/5-130 (West 2008)) required that he be tried as an adult.

¶ 4     In November 2008, defendant filed a motion to quash his arrest and suppress evidence. He sought suppression of two jackets, a hat, an air pistol, and a glove, all of which were seized by police during the search of a backyard shed at 3005 Elisha Avenue, the home of Knighten and his family. In its written response, the State asserted that defendant lacked standing to contest the search and seizure because he had no reasonable expectation of

-2-

privacy in the shed.

¶ 5     At the hearing on the motion, the defense called three witnesses: (1) Zion police officer Joseph Richardt; (2) Kelly Turnipseed, Knighten's mother and the owner of the property at 3005 Elisha Avenue on September 9, 2008; and (3) defendant.

¶ 6     Richardt testified that, at 9:58 p.m. on September 9, 2008, he received a report of a sexual assault "that had just occurred" in the area of 29th Street and Elisha Avenue. The suspects were described as "two male black subjects wearing ski masks, one wearing a blue jacket and the other wearing a camouflage jacket." Richardt also recalled that the dispatcher had said that at least one of the suspects "had a weapon" (Richardt did not specify what kind of weapon). Richardt drove in his squad car to the intersection of 31st Street and the alley that runs between Elisha Avenue and Sheridan Road. He then drove north in the alley toward 30th Street. Richardt saw two individuals behind the Parkside Motel at 3070 Sheridan Road and paused to "ask[ ] them whether or not they had seen anyone in the alley in reference to the subjects [the police] were looking for." The individuals said that they had not seen anyone in the alley. At this point, Richardt estimated, about three or four minutes had transpired since he received the dispatch.

¶ 7     Richardt testified that he then continued north in the alley. After passing several homes, Richardt stopped behind 3005 Elisha, which was about a block north of where the assault reportedly occurred. Although Richardt had passed several homes that had storage sheds in their backyards, what "struck [his] attention" about the property at 3005 Elisha was that its backyard shed appeared to be open or to have no doors at all. Richardt testified that there were no streetlights in the alley, and he could not recall if there was a light in the backyard at 3005 Elisha. Richardt could not see into the shed, which was about 50 feet from his squad car. Richardt notified dispatch that he was going to check the shed. Soon, other officers arrived. Richardt and another officer then opened the gate in the chainlink fence that surrounded the property and walked the approximately 30 feet to the shed. Richardt could not recall definitely whether the shed doors were open or there were no doors at all. Richardt and the other officer entered the shed and saw two coats, one on the floor and the other on a workbench. Richardt noticed that the coats matched the description of the coats described by the dispatcher. Richardt did not recall seeing other items in the shed, but he was aware that other items were later recovered, including ski masks and an air pistol. Richardt acknowledged that he had no warrant to search the property at 3005 Elisha, had not been granted permission by any occupant to search the property, and had no warrant to arrest defendant or Knighten.

¶ 8     Richardt testified that, after seeing the coats, he directed other officers to "secure [the] possible evidence" while he and other officers "observ[ed] the house." After about five minutes, two men matching the description given by the dispatcher emerged from the house. The men were later identified as Knighten and defendant. Richardt told the men to stop, but they ignored him and fled back into the house. Officers then went to the door of the home and were granted permission by Turnipseed to search the premises. Defendant and Knighten were found inside and arrested.

¶ 9     Turnipseed testified that, on September 9, 2008, she arrived home from work at about

8:45 p.m. Defendant arrived with Knighten at about 9 p.m. She did not know where they had been. At about 10 p.m., she heard a knock on her door. She opened the door to find her house "surrounded" by the police. The police asked her if anyone else was in the house, and she replied that her son and his friend were there. The police then remarked that there had been an "occurrence" that night and that they had found "a couple [of] jackets, a gun[,] and a hat" in her backyard shed. Turnipseed allowed the police to enter and search her house. They asked to see defendant and Knighten, and Turnipseed summoned both of them. Turnipseed testified that she did not give the police permission to enter her yard nor did the police present her with a warrant to search her shed or her house.

¶ 10 Turnipseed testified that defendant and Knighten had been friends for two years and that defendant had been to Turnipseed's home before September 9, 2008. Turnipseed testified that the shed in her backyard is "old" and has no doors. Turnipseed stores her lawnmower, rakes, and shovels in the shed, and Knighten stores his bicycle and weightlifting equipment there. According to Turnipseed, defendant also "used" the shed. Asked specifically how defendant "used" the shed, Turnipseed answered that defendant would "hang out" in the shed and lift weights with Knighten. Also, defendant would "put his bike in [the shed] sometimes *** when he would come over."

¶ 11 Defendant testified that he had known Knighten for about two years. He never lived at 3005 Elisha but had been there several times before September 9, 2008. The questioning continued:

"Q. [H]ave you ever been in the shed in [Knighten's] back yard?

A. Yes.

* * *

Q. Would you ever leave any items of property in the shed in [Knighten's] back yard?

A. Yes.

***

Q. Specifically, what would be those items?

A. Jackets, coat, bikes.

Q. And you would leave your bike in the shed?

A. Yes.

Q. And would you ever hang out with [Knighten] in the shed in his back yard?

A. Yes.

Q. And what would you do there?

A. Lift weights; listen to music."

Defendant testified that he was at Knighten's home on the night of September 9, 2008. He wore a blue jacket, which he placed in the shed. Defendant never gave the police permission to search the shed.

¶ 12 The trial court agreed with the State that defendant had no reasonable expectation of privacy in the shed at 3005 Elisha. The court reasoned:

"While it is true here that the defendant used the [shed] with his friend, as clearly

shown by the evidence here, there was no evidence that the defendant would use *** the shed by himself. There was no evidence that he had the ability to control or exclude others from the shed or from this back yard.

There was some evidence that, in fact, he would put his bike in the shed[,] and the defendant testified that he actually put his jacket in the shed on occasions. There was no evidence that he stored any property there; that the bike or jacket was only there until he left.

This Court also did not hear any evidence at all about this defendant having the ability or rather being responsible for anything in the shed."

¶ 13    The court, noting the "case law that says we should not decide cases based solely on the issue of standing," raised *sua sponte* the issue of exigent circumstances. The court's factual findings and legal conclusions are lengthy, but we quote them in their entirety:

"Essentially, the evidence that this Court has heard is that officers are dispatched to this area shortly after a violent crime, a sexual assault, has been committed. It's a matter of minutes or hours, not days, that the officers that are in this area here are searching for two male blacks with ski masks, one wearing some type of a blue jacket and another wearing a camouflage jacket. In checking the area where Officer Richardt notices a shed, he testified that this shed was again within the immediate area, a matter of blocks away from where they were searching; that he initially spoke with two gentlemen in the area to determine whether or not the suspects had went past him, and he was informed that they were not, so he continued to check the area where he ultimately saw a shed; that he didn't recall if the shed had doors or, in other words, whether or not the doors were open on the shed or the shed didn't have doors, but he saw a shed. He testified that he could not see in. He was in the area searching for suspects; they had a description.

He then went into the yard of the home to search the shed. He testified that when he peered into the shed, he saw what he believed was a ski mask and jackets and a handgun[,] and [he] notified dispatch, basically put that out on his radio, seeking assistance. Other officers arrived.

While he was there, two male blacks came out of the house. He secured the area because the coats matched the description, and ultimately, they went to the home and spoke with the occupant, Ms. Turnipseed, and subsequently obtained permission to search the residence.

This Court believes the issue for this Court to decide on this matter in light of the State's motion is whether or not these facts that the officer had would create exigent circumstances to allow them to go on the property and conduct a search. There are a number of factors that the Court must look at to determine whether or not exigent circumstances would warrant or justify this search, and one of those is whether or not the crime *** had recently been committed; whether there was any deliberate or unjustified delay by police during which time they could have obtained a warrant; whether or not it was a serious offense, some type of a crime of violence; whether or not there was a reasonable belief that the suspects were armed and whether the police officers were acting on probable cause, and the list goes on, and I believe a number of those can be

answered with the evidence here.

First of all, we know that we were dealing with a serious offense that had recently been committed and that a handgun was involved. I believe, looking at the totality of the circumstances, that assuming the defendant had standing, the officer had exigent circumstances to enter the back yard and look into what he believed was an open shed to determine whether or not armed suspects were in that building or in that shed, and when he did so, he noticed clothing that matched the description of the offenders, and I believe that it was all reasonable."

¶ 14    The trial court denied the motion to quash and suppress. The case proceeded to a jury trial. As defendant does not dispute the sufficiency of the evidence against him, our recitation of the evidence at trial is limited.

¶ 15    K.H. testified that, on the evening of September 9, 2008, she was at her boyfriend Randy Kneeland's home at 29th Street and Emmaus in Zion. At one point, she left and walked the four blocks to her own home at 3003 Elizabeth. After remaining at home for about 15 minutes, K.H. left and walked to a gas station at 29th Street and Sheridan Road, where she bought a snack. She remained at the gas station for about three minutes before leaving for Kneeland's. While walking down 29th Street, she saw two men emerge from an alley that intersected with 29th Street. One man was wearing a camouflage jacket and the other man a "black hoodie." These men were later identified as Knighten and defendant, respectively. As the men passed her, defendant grabbed K.H.'s arm and put what appeared to be a "black pistol"[1] to her side. K.H. then saw that defendant had a ski mask over his face. Both men took K.H. by the arms and led her, with the gun still pointed at her side, behind some bushes at the side of an apartment building. There, the men told K.H. to get on her knees as they pushed her down. Defendant then forced his penis into K.H.'s mouth while holding the gun to her head. After about two minutes, defendant withdrew his penis and ejaculated onto K.H.'s face and jacket. Defendant then ran off while Knighten forced his penis into K.H.'s mouth. After "a couple of seconds," Knighten withdrew his penis and ran off.

¶ 16    When K.H. was asked to clarify "who was holding the gun," she said: "The first–when they were taking their turns, the first guy with the blue ski mask [defendant], he was holding it, and then he gave it to the guy in the [camouflage] jacket [Knighten]." Elsewhere, K.H. testified that she saw the gun for "two minutes at most" during the attack.

¶ 17    K.H. testified that, after the attack, she went to Kneeland's and told him what had happened. Kneeland called the police.

¶ 18    K.H. testified that she was not wearing a watch on the night of September 9, 2008. She gave varying testimony about the chronology of events that night. Her testimony contained all of the following statements: (1) she "was at [Kneeland's house] at 8:30 p.m."; (2) she "left [Kneeland's] at 8:30 p.m. and *** went home"; (3) she was "at [Kneeland's] house at about [9 p.m.]"; (4) she "was walking back from [Kneeland's] house" "at approximately [9

---

[1]The gun was actually an air pistol, which was later recovered by the police from the shed in Knighten's yard.

p.m.]"; and (5) she "left [her] house at 9:40 p.m.," approximately.[2]

¶ 19    K.H. acknowledged that, in her written statement that she had given to the police on the night of the attack, she did not mention that defendant pointed the gun at her head.

¶ 20    Officer Kenneth Vaughn testified in pertinent part:

"Q. [W]ere you a patrolman with Zion [on September 9, 2008]?

A. Yes, sir.

Q. And were you on duty [at] approximately 9:30 p.m. at night?

A. Yes.

Q. And do you recall responding to an address of 2821 Emmaus [Kneeland's home]?

A. Yes, sir.

Q. For what purpose did you respond to that address?

A. For a sexual assault that had just occurred.

Q. Okay. And you got that call on your dispatch radio, correct?

A. Correct."

¶ 21    Vaughn testified that he conversed with K.H. at Kneeland's home. K.H. said that she had been approached by two men who put a gun to her side, forced her to accompany them behind a building, and then sexually assaulted her. Vaughn saw no signs of a physical struggle on K.H.'s body. Though K.H. was wearing shorts that night and claimed that the assailants had forced her onto her knees, Vaughn saw no cuts or abrasions on her knees.

¶ 22    Vaughn testified that, after taking K.H.'s statement, he passed it on to all other officers.

¶ 23    Richardt gave substantially the same testimony that he gave at the suppression hearing. One notable addition was Richardt's statement that, once he discovered the items in the shed at 3005 Elisha, he and his fellow officers "secured the residence."

¶ 24    Detective Michael Ware testified that, at 10:30 p.m. on September 9, 2008, he received a dispatch that a sexual assault had reportedly occurred. Ware went to Vista Medical Center, where he spoke with K.H. She told him that she had left her house at 9:40 p.m. that night and, after stopping at a gas station, walked on 29th Street toward Kneeland's. While on 29th Street, she was assaulted by defendant and Knighten.

¶ 25    Officer Eric Hill testified that his role on the night of September 9, 2008, was to collect evidence pertaining to the reported sexual assault. Hill searched the shed at Knighten's home and recovered a blue jacket, a camouflage jacket, a blue hat, and an air pistol.

¶ 26    Tiffany Coia, a registered nurse, testified that she administered a sexual assault evidence kit to K.H. on the night of September 9, 2008. Coia acknowledged that her written report of the examination did not indicate any physical injury to K.H. or any claim by K.H. that she was in physical pain.

---

[2]The latter stands out for its incongruity with the remaining assertions, but it is consistent with Detective Michael Ware's account (recounted below) of what K.H. told him when he interviewed her on the night of the attack.

¶ 27     Knighten also testified as part of the State's case. He acknowledged that he had pled guilty to the charges in this case and that his agreement with the State required him to testify as part of its presentation. Knighten testified that, shortly before 10 p.m. on September 9, 2008, he and defendant left Knighten's house and walked to a nearby gas station. As they were walking back from the station, defendant and Knighten formed a plan to rob the first person they saw. Defendant was carrying an air pistol that shot rubber pellets. Knighten was shown the air pistol that was seized from the shed at his home, and he identified it as the gun that defendant was carrying on the night of September 9.

¶ 28     Knighten testified that, when they saw K.H. pass, they grabbed her and defendant put the gun to her side. They then pulled K.H. into nearby bushes, where Knighten kept a lookout while defendant, who was holding the gun to K.H.'s head, forced her to give him oral sex. Knighten testified that defendant then ran off with the gun while Knighten forced K.H. to give him oral sex. After about three or four minutes, Knighten withdrew his penis and told K.H. to " '[g]o on about [her] business.' " Knighten had not ejaculated. After he left K.H., Knighten went to his house, where defendant was waiting on the front porch. Knighten saw that defendant was no longer wearing his coat, and he asked where defendant had put his " 'stuff.' " Defendant replied, " 'I put it in the shed.' " Knighten then gave his coat to defendant, who put it in the shed as well.

¶ 29     Defendant testified in his own defense. He acknowledged that he was carrying an air pistol on the night of September 9, 2008, while walking with Knighten. Defendant was just "joking" with the air pistol that night, however. He denied that he and Knighten planned to rob anyone. On the way back from the gas station, they met K.H. Defendant and Knighten had a conversation with K.H. that turned sexual, and defendant asked her to give him and Knighten oral sex. K.H. agreed, and the three decided to perform the acts outside a nearby apartment building since Knighten thought his mother might be home. K.H. gave defendant oral sex first. She appeared to enjoy the act. During the act, defendant kept the air pistol in his pocket. He denied that he displayed the air pistol to K.H. in a threatening manner that night. After a few minutes, defendant withdrew from K.H.'s mouth and ejaculated next to her. Defendant then told Knighten that they would meet at his house. Defendant left Knighten and K.H. and went to Knighten's home, where he put his jacket, mask, glove, and gun in the shed. Defendant then waited on the front porch for Knighten to return. Defendant did not attempt to enter Knighten's home, because he thought it would be "disrespectful." About five minutes later, Knighten came home.

¶ 30     Defendant testified that he had been friends with Knighten for two years prior to September 9, 2008. He affirmed that he had "hung out" with Knighten in his backyard shed. Defendant had ridden his bike to Knighten's, and during his stays he would keep the bike "at the shed."

¶ 31     The jury convicted defendant of two counts of aggravated criminal sexual assault, with one count based on defendant's accountability for Knighten's actions.

¶ 32     The case proceeded to sentencing. Defendant presented several witnesses in mitigation, including several family members and one friend, who testified that defendant was a good person and that the offenses of which he was convicted were out of character for him. Rather

than recite the relevant portions of the presentence investigation report, the victim impact statement, and the sex offender evaluation, we quote the trial court's sentencing rationale, which incorporates the highlights of those documents:

"[I]t is unfortunate that you find yourself here today being sentenced, but you put all of this in motion. The day you and your friend[,] who I heard at the time was your best friend, Mr. Knighten, decided that you would walk through the village of Zion carrying a plastic gun and then to find some young lady who [*sic*] you barely knew and to ask her to perform oral sex on you.

A number of people have talked about your character and how this is so out of character for you to be accused of this incident here. And I can tell you in looking at this presentence investigation report, you've essentially lived a law-abiding life, you've not been involved in the criminal justice system, and it's unfortunate that when you decided to get in this system, *** that you jumped right out of the pan into the fire ***.

This night not only set in place for you a nightmare, that is[,] being detained for these periods of days, but it's also had a tremendous impact upon this victim, a victim who from reading this report you still are able to make comments about this victim, unwholesome comments. But for this victim, now she will have to deal with this fact that at gunpoint, two men forced themselves upon her, and I'm sure that has changed her life. She talks about it in her victim impact statement.

And so when I hear from the relatives and friends of yours talking about how this is not your nature and not your character, I also look at the various reports that I've made comments about, and I can see when you were in the juvenile detention facility that you spent days in isolation because you were using vulgar language, swearing at the staff, noncompliant, and making sexually explicit comments to the family therapist. And I'm sure the family doesn't know that about you, but you did that while you were in custody when you should have been on your best behavior.

I also see that you on another incident was [*sic*] disrespectful and again often using inappropriate language to the staff and noncompliant and beginning to make unreasonable demands. And then when you left the juvenile facility, you arrived here in the Lake County jail, and I see that during one of your GED classes, the instructor had to kick you out because you were not working to his capacity, and you were goofing around in the classroom.

So it appears *** that there are occasions when outside of the presence of family and loved ones that you do act out and do things outside of your character.

I'm not sure regarding the high school transcripts [showing defendant's failing grades], and so I will defer to that fact that it is possible that you were doing well in school because I'm sure if these grades that I see, all of the F's could reflect the fact that you were in jail and could not finish because I don't see grades leading up to the time before you were taken into custody. So I assume that as your family members testified, that you were doing well in school and actively engaged in sports.

But the [sex offender] evaluator here was trying to *** get a good handle on your nature and character and your mental health ***.

*** [T]hey found you to be a moderately high risk to reoffend, and a significant amount of that from reading this report is attributable to your young age, and it's because when one is at your age willing to engage in this kind of conduct, that it is likely that you would act out again with this antisocial behavior.

But the other factor that led them to that result again seems to center around what, and I quote, 'Mr. Nichols, has an unrealistic plan and has a negative attitude toward intervention.' And I understand, Mr. Nichols, that that may in fact be based upon the fact that you continue to deny this allegation, and for that reason, you don't believe any other approach on your part is appropriate because you are maintaining your innocence, and that may very well be the reason why all of the people that have evaluated you seem to talk about you not being realistic about what it is that you're facing.

* * *

And so Mr. Nichols, I don't know what kind of a young man you were prior to the September date that brings you before me. Your family members and friends have said you liked playing ball, and were a good kid, a nice guy, a cool one, somebody to have fun with, a loving and caring person, but the evidence that was introduced in the trial was anything but that. The evidence introduced at the trial was we had a cold, calculating individual who pulled a gun on a young, innocent girl who then forced her to perform oral sex on him, who prior to that was prepared to find the first person they could confront and jack them or rob them as your co-offender stated.

He also indicated that he was a good friend of yours and *** he testified to his involvement as to what he did, and he also testified to what you did. And that person who did the things that Mr. Knighten said he did and [K.H.] said he did is not a cool, good person–that's a person who warrants time in the Department of Corrections because you pulled a gun on a young person and sexually assaulted her."

¶ 33 Aggravated criminal sexual assault is a Class X offense that carries a prison term of 6 to 30 years. 730 ILCS 5/5-8-1(a)(3) (West 2008). Since defendant was convicted of sexually assaulting K.H. while threatening her with an object that appeared to be a dangerous weapon (720 ILCS 5/12-14(a)(1) (West 2008)), Illinois law required a sentencing enhancement of an additional 10 years for each conviction (720 ILCS 5/12-14(d)(1) (West 2008)). Finally, because the convictions were of aggravated criminal sexual assault, the mandatory consecutive sentencing statute required that the sentences on those counts be served consecutively. 730 ILCS 5/5-8-4(a)(ii) (West 2008).

¶ 34 On each count, the trial court imposed the minimum imprisonment term, six years, for a Class X felony. By operation of the sentencing enhancement statute, each sentence was increased to 16 years. By operation of the mandatory consecutive sentencing statute, the two 16-year terms would run consecutively. The court noted that defendant would serve the aggregate sentence at 85%.

¶ 35 Defendant's posttrial motion was denied, and he timely appeals.

II. ANALYSIS

A. Motion to Quash and Suppress

1. Standing

¶ 39    On appeal, defendant challenges both grounds on which the trial court denied his motion to quash and suppress, *i.e.*, that he lacked standing and, alternatively, that exigent circumstances justified the police in dispensing with a warrant to search the grounds of Knighten's home.

¶ 40    Review of a trial court's decision on a motion to quash and suppress presents a mixed question of law and fact. *People v. McDonough*, 239 Ill. 2d 260, 265-66 (2010). "Findings of historical fact made by the circuit court will be upheld on review unless such findings are against the manifest weight of the evidence." *Id.* at 266. "However, a reviewing court remains free to undertake its own assessment of the facts in relation to the issues presented and may draw its own conclusions when deciding what relief should be granted." *Id.* Accordingly, we review *de novo* the ultimate question of whether the evidence should be suppressed. *Id.* In reviewing the trial court's decision, we consider both the evidence at the suppression hearing and the evidence at trial. *People v. Slater*, 228 Ill. 2d 137, 149 (2008).

¶ 41    The issue of standing is governed by the following principles:

    "A fourth amendment violation can be urged successfully only by those whose rights have actually been violated by the search itself, not by those who have been aggrieved solely by the introduction of damaging evidence. [Citation.] Capacity to claim fourth amendment protection depends, not upon a property right, but upon whether the aggrieved person has a legitimate expectation of privacy in the place invaded. [Citations.] A subjective expectation of privacy is legitimate if it is one that society is prepared to recognize as reasonable. [Citation.] Whether one has a legitimate expectation of privacy in a place is measured by an objective standard drawn from common experience. [Citation.] Property ownership, while it is not dispositive, is a factor to be considered in determining whether an individual has standing to test the constitutionality of a search and seizure. [Citations.] Other factors relevant in determining the existence of a reasonable expectation of privacy include whether the defendant was legitimately present in the area searched; whether the defendant had a possessory interest in the area or the property seized; whether the defendant had previously used the area searched or the area seized; whether the defendant had the ability to control the property or to exclude others from using it; and whether the defendant had a subjective expectation of privacy in the property. [Citation.] The question whether a defendant has a reasonable expectation of privacy in the area searched or in the items seized must be answered in light of the totality of the circumstances of the particular case. [Citation.]" *People v. Kidd*, 178 Ill. 2d 92, 135-36 (1997).

    The defendant has the burden of demonstrating that he has standing to challenge the search. *People v. Rice*, 286 Ill. App. 3d 394, 399 (1996).

¶ 42    We address first defendant's challenge to the trial court's factual finding that he kept items at Knighten's home only when he was visiting. Specifically, the court found "no evidence that [defendant] stored any property there" and concluded that "the bike or jacket

-11-

was only there until [defendant] left." Defendant contends that "[t]he record *** contains no statement whatsoever that he only stored personal property in [the] shed on the occasion when he was actually present at 3005 Elisha Avenue. Rather, the record presented was that he would leave his personal property and effects in the shed." We disagree that the court's finding was against the manifest weight of the evidence.

¶ 43    Defendant and Turnipseed were the sole witnesses who testified to defendant's use of the shed. When Turnipseed was asked how defendant "used" the shed, she replied that defendant would "hang out" and lift weights in the shed and "would put his bike in there sometimes *** *when he would come over*" (emphasis added). The only item of defendant's that Turnipseed mentioned was his bicycle, and it was reasonable for the trial court to infer both that (1) the bicycle was defendant's means of transportation to Knighten's home; and (2) the bicycle remained there only while defendant remained there.

¶ 44    Defendant testified about the shed both at the suppression hearing and at trial. At the suppression hearing, when asked if he "left any items of property in the shed," defendant answered that he would leave his "jacket, coats, bikes." He testified, in follow-up, that he "would leave [his] bike in the shed." At trial, defendant testified that he would keep his bike in Knighten's shed when he rode to Knighten's. The trial court could have had at least two sound reasons for construing defendant's remarks to mean that he kept the mentioned items at Knighten's only while he was visiting. First, such a reading would harmonize defendant's account with that of Turnipseed, who, when asked how defendant "used" the shed, did not mention defendant leaving anything in the shed except during visits. Second, the court could consider the unlikelihood that defendant would deem it prudent to use an outdoor shed with no doors for the extended placement of clothing like hats and jackets. As for defendant's claim to have left "bikes" at Knighten's house, it was reasonable for the court to conclude that defendant meant only the bike that he rode to Knighten's. Accordingly, the court's finding that defendant kept items in the shed only during visits was not against the manifest weight of the evidence.

¶ 45    Applying the factors articulated in *Kidd*, we recognize that it is not dispositive that defendant did not own the shed. Few of the other factors, however, favor defendant. He did own the personal articles that were seized and, both on the night of the search and seizure and on prior occasions, he was legitimately present in the shed. His use, however, of the shed was intermittent and insubstantial. The shed was simply a place where he was entertained as a social guest. As would any visitor to a friend's home, defendant kept his outer clothing–his hat and jacket–and his means of transportation–a bicycle–at Knighten's during visits, and the shed functioned on some occasions as the temporary repository for those items. Additionally, there is no evidence that defendant ever spent the night at Knighten's. Finally, even assuming that defendant had the right, as a social guest, to exclude from the shed any trespassers at Knighten's home, there was nothing to suggest that he would have had the right to exclude others who, like himself, were legitimately present on the property. Finally, there is no evidence that defendant had a subjective expectation of privacy in the shed. The *Kidd* factors weigh against finding that defendant had a reasonable expectation of privacy in the shed.

¶ 46    Although each case is fact-sensitive, "Illinois courts *** have repeatedly declined to grant standing for the purposes of contesting a search and seizure to persons who are guests

or merely present in someone else's home or on another person's property which is searched." *People v. Ervin*, 269 Ill. App. 3d 141, 147 (1994). Even repeat guests like defendant may be found to lack standing. See, *e.g*, *id.* at 145-48 (the defendant lacked a reasonable expectation of privacy in the home of his sick ex-wife, though he visited her once or twice a week to check on her welfare and to prepare food for her; the defendant did not stay overnight and did not keep any clothes at the home while away); *People v. Williams*, 186 Ill. App. 3d 467, 471-72 (1989) (the defendant lacked a reasonable expectation of privacy in his girlfriend's apartment, where the defendant slept overnight at the apartment, at most, once a week, and had no personal effects or clothing at the apartment).

¶ 47    The decisions upon which defendant relies are materially different from the case at hand. In *People v. Alexander*, 272 Ill. App. 3d 698 (1995), the defendant moved to suppress stolen-vehicle parts seized from the garage of a home owned by the defendant's sister. The appellate court held that the defendant had a reasonable expectation of privacy in the garage, based on the following evidence: (1) the testimony of a neighbor of the defendant's sister that the defendant formerly lived at the address, that he still "operated an auto parts business out of the garage," and that he mentioned on one occasion that he had tools in the garage; (2) the testimony of another neighbor that the defendant "occasionally worked on cars out of the garage"; (3) the defendant's testimony that he "sometimes worked on cars [in the garage] with his brother-in-law"; and (4) a police officer's testimony that the defendant said that he "used the garage and was responsible for everything in it." *Id.* at 700-02.

¶ 48    Similarly, in *People v. Johnson*, 237 Ill. App. 3d 860, 863, 865 (1992), the defendant did not reside at the premises but the owner allowed him to store furniture and tools there and to make phone calls in connection with his business as a self-employed carpenter.

¶ 49    In contrast to the defendants' use of the premises in *Johnson* and *Alexander*, defendant did not use the shed for any kind of ongoing activity and did not leave personal items there in his absence.

¶ 50    In *People v. Parker*, 312 Ill. App. 3d 607 (2000), the police searched for the defendant, a murder suspect, at his grandmother's house. The defendant was not there, but the grandmother told the police that he did live there. Some neighbors informed the police that the defendant was hiding at his mother's home, at a different address. The police arrived at the mother's home at about 10 p.m. and found the defendant inside. What happened next was disputed. The defendant testified that, after he was arrested, the police made him sit in a front room while they searched the entire house. By contrast, the police testified that, after he was arrested, the defendant, who was barefoot, asked to get some additional clothing from inside the house and then led the police to a bedroom where he retrieved socks, shoes, and a jacket. *Id.* at 609-11. (Though the decision did not make it clear, it was presumably some of these items that the defendant sought to suppress.) When processed at police headquarters, the defendant listed his grandmother's as his home address, but he testified at the suppression hearing that he lived at his mother's house, and the parties introduced stipulated testimony from the defendant's mother that the defendant lived there. *Id.* Based on the testimony of the defendant and his mother, corroborated by the presence, in the bedroom, of clothing that the defendant claimed as his own, the court drew the factual conclusion that the defendant "either resided permanently, temporarily or at very least was an overnight guest in his

-13-

mother's home." *Id.* at 615. Because the law was "well established that an overnight guest enjoys a reasonable expectation of privacy" and because the evidence showed, "at a minimum," that the defendant was an overnight guest in his mother's house, the court drew the legal conclusion that the defendant had standing to contest the seizure of items from the bedroom. *Id.*

¶ 51   In both this case and *Parker*, items of an accused's clothing were found on the premises of a third party at approximately 10 p.m. There was testimony in *Parker*, however, both from the defendant himself and from his mother, that the defendant lived with her. Here, of course, there was no dispute that defendant did not live at Knighten's.

¶ 52   Defendant, however, claims that it was not essential to the decision in *Parker* that the defendant was apparently a resident of his mother's household. We agree, as the court in *Parker* noted that the evidence showed that the defendant was *at least* an overnight guest given that he was barefoot in the house at 10 p.m. and had such items as socks in one of the bedrooms. There was no evidence here, however, that defendant made himself as comfortable in Knighten's home or otherwise displayed an intent to spend the night.

¶ 53   The final case that defendant cites is *People v. Polk*, 194 Ill. App. 3d 172 (1990), where the defendant, Polk, challenged the search of a purse owned by his traveling companion, Hobson. Polk and Hobson, who had just arrived on a flight, were standing on the sidewalk outside the terminal when they were approached by an officer, Crowley, who was watching travelers for behavior that met the profile of a drug courier. What happened next was disputed, but the trial court (as the appellate court noted) found Polk and Hobson to be the more credible witnesses. They testified that Crowley, who was in plainclothes but did not show any identification, asked to see the suitcase that Polk was carrying. Crowley then searched the suitcase without Polk's or Hobson's consent. Afterwards, Crowley "grabbed" Hobson's purse, which was strapped over her shoulder. Polk grabbed the purse strap and pulled against Crowley. Eventually, the purse strap broke and Crowley was left with the purse while Polk fled, only to be apprehended within seconds by another officer. *Id.* at 172-73. The purse was found to contain drugs. *Id.* at 175.

¶ 54   The appellate court held that Polk had a reasonable expectation of privacy in Hobson's purse:

"[Polk] had a possessory interest in the personal luggage of his companion when he went to her aid in an attempt to keep Crowley from grabbing her purse off of her shoulder. It was in Polk's possession when Crowley seized it.[3] Property ownership may be a factor in determining whether a party has standing to test the constitutionality of a search and seizure, but it is not dispositive. Other relevant factors include a reasonable expectation of privacy, whether a defendant was legitimately present in the area searched, defendant's possessory interest in the area or property seized, his ability to control or exclude others' use of the property, and a subjective expectation of privacy in the property. [Citation.] Although Polk disclaimed ownership of the purse, the evidence indicated that he had

---

[3]Evidently, the court meant constructive possession, for by the accounts of Hobson and Polk, the purse was on Hobson's shoulder when Crowley grabbed it.

possession of, and a reasonable right to exclude others from, seizure of his companion's property. Therefore, Polk had standing to assert suppression of the purse's contents." *Id.* at 176.

¶ 55 The *Polk* court's sole express reason for finding that the defendant had standing was that he had possession of the purse and, therefore, had the right to exclude others from seizing it. In the case at hand, by contrast, defendant did not have "possession" of the shed when the police searched it, but was inside the house. Defendant, therefore, had to rely on other indicia of standing, and, as we noted above, those indicia are lacking.

¶ 56 For the foregoing reasons, we conclude that the trial court did not err in concluding that defendant lacked standing to challenge the search of the shed and the seizure of the items therein.

¶ 57                                3. Exigent Circumstances

¶ 58 Defendant also challenges the trial court's finding of exigency. The State elects not to respond to the argument, claiming that it is "not necessary" in light of the State's position on standing. (This was, of course, questionable appellate strategy given the obvious possibility that we would rule against the State on the issue of standing.) Defendant argues that the State's election amounts to a concession. Even if we agreed with that assessment, we would still address the issue because we are not bound by a party's concession (*People v. Horrell*, 235 Ill. 2d 235, 241 (2009)).

¶ 59 The United States and Illinois Constitutions protect individuals from unreasonable searches, and, generally, searches without a warrant are presumptively unreasonable. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6; *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). One exception to the warrant requirement lies where " 'there are exigent circumstances which make it impractical to obtain a warrant.' " *People v. Ferral*, 397 Ill. App. 3d 697, 706 (2009) (quoting *Alexander*, 272 Ill. App. 3d at 704). "Factors which have been considered relevant to a determination of exigency include whether: (1) the crime under investigation was recently committed; (2) there was any deliberate or unjustified delay by the police during which time a warrant could have been obtained; (3) a grave offense was involved, particularly a crime of violence; (4) there was reasonable belief that the suspect was armed; (5) the police officers were acting on a clear showing of probable cause; (6) there was a likelihood that the suspect would escape if he was not swiftly apprehended; (7) there was strong reason to believe the suspect was in the premises; and (8) the police entry was made peaceably, albeit nonconsensually." *People v. Williams*, 161 Ill. 2d 1, 26 (1994). This is not an exhaustive list of relevant factors; the court is to consider the totality of the circumstances in judging whether the police acted reasonably. *Id.* The overarching criterion is reasonableness. *Id.* It is the State's burden to establish exigent circumstances justifying a warrantless search and seizure. *People v. Foskey*, 136 Ill. 2d 66, 75 (1990).

¶ 60 As defendant notes, the trial court, in concluding that Richardt's warrantless search of the shed at Knighten's home was justified, relied primarily on four factors: (1) a violent crime (2) had recently been committed, that is, just "minutes" before Richardt searched the shed; (3) the suspects reportedly were armed; and (4) the suspects might be hiding inside the

"open" shed.

¶ 61    First, defendant disputes the finding that the assault occurred mere "minutes" before the search of the shed. He claims that the assault "had to have occurred between 9:00 p.m. (the time that [K.H.] left her house to go to her boyfriend's house [citation]) and 9:30 p.m. (the time Officer Vaughn arrived at [K.H.'s] boyfriend's home in response to a report of an alleged sexual assault [citation])." The trial court evidently was relying on Richardt's testimony that the dispatch he received at 10 p.m. informed him that the assault "had just occurred." Defendant is correct that, based on K.H.'s testimony, the assault might have occurred closer to 9 p.m. The court, however, was correct in relying strictly on what the officers knew as to when the crime occurred. See *United States v. Banks*, 540 U.S. 31, 39 (2003) (exigency not judged by facts unknown to officers when they acted). Since, however, it is the *collective* knowledge of the officers that is the criterion (see *People v. Fonner*, 385 Ill. App. 3d 531, 541 (2008)), Vaughn's testimony is relevant to the extent that it reveals what he knew as to when the assault occurred. Vaughn's testimony was, in fact, not definite on the issue. When asked if he was "on duty [at] approximately 9:30 p.m. [on September 9, 2008]," he replied, "Yes." He was then asked if he "recall[ed] responding to an address of 2821 Emaus [*sic*]," and he responded, "Yes, sir." These answers did not expressly identify 9:30 p.m. as the time that Vaughn arrived at Kneeland's house.

¶ 62    In any case, even if the trial court was incorrect, and the police knew or should have known that the assault had occurred as early as 9 p.m., the court's finding of exigency would not be undermined. There is no bright-line rule for the recency of the crime; courts have upheld warrantless searches occurring after temporal gaps as great as or greater than that between the crime and the search here. See, *e.g.*, *People v. Abney*, 81 Ill. 2d 159, 169 (1980) (suspect in severe beating arrested an hour and a half after the victim alleged the suspect's involvement); *People v. Williams*, 315 Ill. App. 3d 22, 39 (2000) (police arrested murder suspect "within four hours of learning of his involvement from the confessions of the other defendants"). Here, the police received a report of a sexual assault, a violent crime. Richardt was told that at least one of the suspects was carrying a "weapon." According to Vaughn, K.H. reported that the suspects threatened her with a gun. The passage of an hour would not have lessened the exigency, in view of the report of a violent crime together with the potential for further violence.

¶ 63    Defendant claims, however, that "a door-less shed, without more, hardly justifies the warrantless entry and search of a private residence, especially given that this was a residential area with at least five other storage sheds." We disagree. Richardt did testify to seeing several other storage sheds, but what "struck" him about Knighten's was that its doors appeared to be open or missing. Richardt could have reasonably inferred that, if the doors were open when the suspects passed, the shed would tempt them as a ready hiding place given that the property was only one block from where the assault reportedly occurred and that the shed was in the backyard contiguous to the alley. Alternatively, Richardt could have reasonably inferred that the doors were open because the suspects entered the shed in haste–or left in haste (yet possibly leaving behind some clues). Contrary to defendant's position, the open doors were significant and justified Richardt in entering the yard to investigate. Though it appears that the shed did in fact lack doors, Richardt could not definitely recall whether he

-16-

noticed this when approaching the shed.

¶ 64	Defendant further contends that, by the trial court's reasoning, Richardt "would have been free to enter every yard with a shed in order to search them without a warrant," and, "for that matter, police officers would be entitled to enter and search *any* private residence without a warrant or probable cause so long as there was an open door in the area where an incident occurred" (emphasis in original). Defendant oversimplifies the issue. The shed at Knighten's home stood out in Richardt's mind because its doors appeared to be open or missing. The shed did not present just any "open door" but rather a potential hiding place that would have been especially attractive given its proximity to the alley.

¶ 65	As defendant notes, the trial court did not analyze the remaining factors, but we conclude that they favor the State. First, there was no evidence of any delay during which the police might have obtained a warrant. There is no suggestion that Vaughn delayed in conveying K.H.'s allegation to his fellow officers or that Richardt delayed once he received the dispatch. Defendant, however, contends that Richardt's actions subsequent to the search of the shed signaled that he did not believe that there were exigent circumstances:

> "Tellingly, despite the fact [that] Officer Richardt and others observed two individuals matching the descriptions of the suspects (and seized incriminating evidence), Officer Richardt did not pursue the suspects into the house and made no attempt to obtain a search or arrest warrant. Instead, the police sought the homeowner's consent *before* going on to finish searching the rest of the property. If, indeed, exigent circumstances existed such that Officer Richardt was justified in entering the backyard in order to search the shed, those same exigent circumstances would have permitted the police to search the remainder of the property and residence–especially now having observed two suspects hiding in the house. But they did not. Officer Richardt knew that there were no exigent circumstances in the first instance, and importantly, that he needed a search warrant or consent before searching the rest of the property." (Emphasis in original.)

Defendant attempts to extrapolate what Richardt subjectively believed about the situation so as to expose an inconsistency in Richardt's position. This approach is fundamentally misguided. Police action is valid under the fourth amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify the action. *People v. Wear*, 229 Ill. 2d 545, 566 (2008). The officer's subjective motivation is irrelevant. *Id.* Our concern is whether, under the facts known to Richardt when he searched the shed, it was objectively reasonable for him to forgo obtaining a warrant. How Richardt acted *after* he searched the shed does not impact this inquiry.

¶ 66	Proceeding with the remaining factors, we note that Richardt was acting on a clear showing of probable cause. Defendant does not dispute that Richardt had probable cause to believe that K.H. was sexually assaulted at gunpoint by two men who were as she described them. Defendant, rather, argues that Richardt had only a "hunch" that the suspects were hiding in the shed and he lacked "strong reason to believe that the suspect was in the premises" (*Williams*, 161 Ill. 2d at 26). We disagree, as the shed was only a block from where the assault allegedly occurred. As noted, moreover, the fact that the doors appeared to be open or missing gave Richardt additional reason to believe that the suspects possibly

were or had been hiding in the shed.

¶ 67    Third, Richardt had cause to believe that the suspects might well escape unless swiftly apprehended. Defendant claims that there is "nothing in the record" to suggest this likelihood. Defendant submits that Richardt could have contacted the owner of the property at 3005 Elisha, or obtained a search warrant, prior to entering the shed. The record suggests otherwise. K.H. testified that each perpetrator ran off after assaulting her. The evidence also indicates that the crime occurred in a residential neighborhood consisting of single-family homes together with yards and outbuildings. This environment provided manifold potential hiding places that the suspects could employ in fleeing the area.

¶ 68    Finally, the police entry into the shed was peaceable, albeit without consent.

¶ 69    Therefore, assuming that defendant had standing to challenge the search of the shed, the State established that exigent circumstances justified the warrantless search.

¶ 70                    B. Constitutionality of Defendant's 32-Year Sentence

¶ 71    Defendants notes that his sentence resulted from the convergence of several statutes. First, because defendant was charged with aggravated criminal sexual assault, the automatic transfer statute (705 ILCS 405/5-130 (West 2008)) required that he be tried as an adult. Second, the accountability statute (720 ILCS 5/5-2 (West 2008)) exposed defendant to criminal liability for Knighten's actions. Third, due to defendant's use of an object that appeared to be a dangerous weapon, the sentencing enhancement for aggravated criminal sexual assault (720 ILCS 5/12-14(d)(1) (West 2008)) required an additional 10 years for each count, for which there already was a sentencing range of 6 to 30 years. Fourth, the mandatory consecutive sentencing statute (730 ILCS 5/5-8-4(a)(ii) (West 2008) (now 730 ILCS 5/5-8-4(d)(2) (West 2010))) required consecutive sentences for the two convictions of aggravated criminal sexual assault. The trial court sentenced defendant to 16 years on each count, which included the sentencing enhancement. The sentences had to be served consecutively, for a total sentence of 32 years. Defendant would serve the sentence at 85%.

¶ 72    Defendant argues that the mandatory consecutive sentencing statute is unconstitutional as applied to him. Statutes are presumed constitutional. *People v. Boeckman*, 238 Ill. 2d 1, 6 (2010). To rebut the presumption, the party challenging the statute must clearly establish a constitutional violation. *Id.* "A holding that a statute is unconstitutional as applied does not broadly declare a statute unconstitutional but narrowly finds the statute unconstitutional under the specific facts of the case." *People v. Huddleston*, 212 Ill. 2d 107, 131 (2004). Courts "generally defer to the legislature in the sentencing arena because the legislature is institutionally better equipped to gauge the seriousness of various offenses and to fashion sentences accordingly." *People v. Sharpe*, 216 Ill. 2d 481, 487 (2005). "The legislature's discretion in setting criminal penalties is broad, and courts generally decline to overrule legislative determinations in this area unless the challenged penalty is clearly in excess of the general constitutional limitations on this authority." *Id.* "[T]he legislature has the power to prescribe penalties for defined offenses, and that power necessarily includes the authority to prescribe mandatory sentences, even if such sentences restrict the judiciary's discretion in imposing sentences." *Huddleston*, 212 Ill. 2d at 129. "The triggering offenses listed in

section 5-8-4(a) are crimes of a singular nature, involving 'particularly serious invasions of the person.' " *People v. Curry*, 178 Ill. 2d 509, 538 (1997) (quoting *People v. Toliver*, 251 Ill. App. 3d 1092, 1100 (1993)). "By enacting the mandatory consecutive sentencing provision of section 5-8-4(a), the legislature sought to punish the commission of triggering offenses more harshly than the commission of other crimes." *Id.*

¶ 73   Defendant claims that section 5-8-4(a)(ii), as applied in this case, violates two clauses of the Illinois Constitution: the proportionate penalties clause (Ill. Const. 1970, art. I, § 11) and the due process clause (Ill. Const. 1970, art. I, § 2). We address these provisions in turn.

¶ 74                              1. The Proportionate Penalties Clause

¶ 75   The proportionate penalties clause states that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. "[T]o succeed on [a] proportionate-penalties claim, [a] defendant must show that either the penalty imposed (1) is cruel, degrading, or so wholly disproportionate to the offense that it shocks the moral sense of the community *** or (2) differs from one imposed for an offense containing the same elements." *People v. Brown*, 375 Ill. App. 3d 1116, 1118 (2007). Defendant argues solely under the first alternative. Specifically, he contends that his sentence is disproportionate when considered in light of his age, his criminal history, and the seriousness of the offenses.

¶ 76   Defendant submits that his young age and lack of any significant criminal history show his rehabilitative potential. In evaluating this assertion, we note that our supreme court has observed that " 'there is no indication [in our constitution] that the possibility of rehabilitating an offender was to be given greater weight and consideration than the seriousness of the offense in determining a proper penalty.' " *Huddleston*, 212 Ill. 2d at 129 (quoting *People v. Taylor*, 102 Ill. 2d 201, 206 (1984)). Before considering defendant's rehabilitative potential, we note the seriousness of the offenses he committed. "Factors to be considered in determining the seriousness of an offense include the degree of harm, the frequency of the crime, and the risk of bodily injury associated with it." *Id.* The trial court rightly emphasized the brutal and degrading nature of the crime. The evidence shows that defendant and Knighten seized K.H. from the street, leading her away as defendant pointed at her side what appeared to be a gun. Once they were behind some nearby bushes, defendant, with the gun now pointed at K.H.'s head,[4] forced her to give him oral sex. Defendant then fled with the gun, but left K.H. with Knighten, who forced her to perform oral sex on him as well. Defendant stresses that K.H. apparently was not physically harmed. He also points out that the attack was a "one time, impulsive act" and that K.H. was not "targeted over an extended period of time." Defendant also emphasizes the brevity of the attack, as the assault by defendant lasted two minutes while the assault by Knighten lasted mere seconds. These points do not detract from K.H.'s wrenching description of the *emotional* damage the offenses caused her, as alluded to by the trial court at sentencing.

_____

[4]Contrary to defendant's suggestion, K.H. was consistent in her testimony that defendant pointed the gun initially at her side and later at her head.

-19-

Importantly, though defendant speaks of an "act," there were actually two acts: one by defendant and one by Knighten. "The purpose of the [mandatory consecutive sentencing] statute is to deter the commission of further offenses once an initial offense has been completed" or, more specific to the case of a sexual assault, "to deter further assaults or repeated violations against a victim." *Toliver*, 251 Ill. App. 3d at 1100. The statute was designed for just the scenario that occurred here, where the victim was subjected to successive assaults.

¶ 77 Defendant, however, attempts to minimize his involvement in Knighten's assault on K.H. Defendant notes that he left–taking the gun with him–before Knighten assaulted K.H. We note that K.H. did not, as defendant claims, clearly testify that when he left defendant took the gun with him rather than hand it over to Knighten. In any event, assuming that defendant did leave with the gun, defendant's assertion that this mitigates his responsibility for Knighten's assault is not well taken. It was defendant who held the gun to K.H.'s side as he and Knighten led her to a concealed area. It was defendant who placed the gun to K.H.'s head and demanded that she give him oral sex. Defendant might have left the scene, but he also left K.H. in the hands of his accomplice. K.H.'s testimony leaves little doubt that she felt no less compulsion to submit to Knighten once defendant was gone with the gun. Defendant cannot reasonably claim that he had "limited involvement" in Knighten's assault on K.H.

¶ 78 We note that the trial court did not lack all discretion in sentencing defendant. A range of 6 to 30 years (not including the sentencing enhancement) was available on each count. This is not a situation where the sentencing scheme forced the trial court to impose the same sentence on all defendants regardless of their degree of participation in the offense. See *People v. Miller*, 202 Ill. 2d 328, 342 (2002) ("the convergence of the Illinois [automatic] transfer statute, the accountability statute, and the multiple-murder sentencing statute eliminates the court's ability to consider any mitigating factors such as age or degree of participation"). Had this been a case of serial assaults on K.H. over an extended period of time, the court would have had the ability to impose a sentence of greater than six years on each count, as proportionate to that degree of wrongdoing.

¶ 79 Returning to the issue of defendant's rehabilitative potential, we note that both our supreme court and the United States Supreme Court have observed that sex offenders have a significant rate of recidivism. See *Huddleston*, 212 Ill. 2d at 137-38 (noting that the Illinois legislature "has responded again and again to the propensity of sex offenders to repeat their crimes and to increases in the incidence of sexual assault and abuse cases"; affirming natural life sentence for repeated acts of predatory criminal sexual assault of a child) (citing *McKune v. Lile*, 536 U.S. 24, 34 (2002) (plurality op.) (remarking that the rate of recidivism among sex offenders is "frightening and high")). The trial court duly noted the substantial testimony at sentencing that defendant was a good person and that the crime was out of character for him. The court went on, however, to note reports of defendant's poor behavior while incarcerated. First, defendant was expelled from a GED class for his poor efforts and horseplay. Second, defendant was placed in isolation for using vulgar language toward staff, making sexually explicit comments to a therapist, and being noncompliant. The court inferred from these reports that defendant was indeed capable of acting "outside of [his]

character." Finally, the court took into consideration the sex offender evaluation. The evaluator wrote that defendant's "lack of remorse and lack of empathy for the victim is striking and is troubling in that he does not seem to understand how it is that others would find his way of thinking, feeling[,] and perceiving as problematic." The court alluded to defendant's "unwholesome" comments about K.H., as reported in the evaluation. Specifically, defendant told the evaluator that K.H. was a " 'whore.' " The evaluator found that defendant was at a "moderate" risk to reoffend, based on his young age and other factors, including "potential for psychopathy," "extreme minimization/denial of offense," "attitudes that support or condone offenses," and "unrealistic plans *** and negative attitude toward intervention." The evaluator wrote that defendant was "in need of sex offender treatment but will not benefit from such treatment until he is willing to concede he has a sexual offending problem." Thus, at the time of sentencing, defendant had taken few steps that showed definite rehabilitative potential. Considering this and the gravity of the offenses, we cannot say that defendant's sentence violated the constitutional requirement of proportionality.

¶ 80        Defendant likens this case to *Miller*, where the 15-year-old defendant was approached on the street by two men armed with guns and asked to stand as a lookout. The defendant agreed to serve as a lookout, but he never touched the guns. "One minute later" (to quote the supreme court), the men fired shots at two other men, killing them. *Miller*, 202 Ill. 2d at 331. The defendant was charged with two counts of first-degree murder as an accomplice and, under the automatic transfer statute, was prosecuted as an adult. He was convicted on both murder counts. At the time, section 5-8-1(a)(1)(c)(ii) of the Unified Code of Corrections (the multiple-murder statute) (730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 1996)) provided that any defendant who was convicted of the first-degree murder of more than one victim must be sentenced to natural life imprisonment, regardless of the defendant's age. The trial court refused, on constitutional grounds, to impose a sentence of natural life imprisonment and instead sentenced the defendant to 50 years in prison. *Miller*, 202 Ill. 2d at 332-33.

¶ 81        The supreme court affirmed, agreeing with the defendant that the multiple-murder statute, as applied to him, violated the proportionate penalties clause. The court reasoned:

"[A] mandatory sentence of natural life in prison with no possibility of parole grossly distorts the factual realities of the case and does not accurately represent defendant's personal culpability such that it shocks the moral sense of the community. This moral sense is particularly true, as in the case before us, where a 15-year-old with one minute to contemplate his decision to participate in the incident and stood as a lookout during the shooting, but never handled a gun, is subject to life imprisonment with no possibility of parole–the same sentence applicable to the actual shooter. Our decision does not imply that a sentence of life imprisonment for a juvenile offender convicted under a theory of accountability is never appropriate. It is certainly possible to contemplate a situation where a juvenile offender actively participated in the planning of a crime resulting in the death of two or more individuals, such that a sentence of natural life imprisonment without the possibility of parole is appropriate. However, that is not the case before this court–as recognized by [the trial court] during sentencing, this case presents the least culpable offender imaginable, a 15-year-old who had 'about a minute from the time this plan began until the act was completed by other persons.'

*** [T]he convergence of the [automatic transfer statute], the accountability statute, and the multiple-murder sentencing statute eliminates the court's ability to consider any mitigating factors such as age or degree of participation. A life sentence without the possibility of parole implies that under any circumstances a juvenile defendant convicted solely by accountability is incorrigible and incapable of rehabilitation for the rest of his life." *Id.* at 341-43.

¶ 82    The facts in *Miller* are markedly distinguishable from the facts at hand. The most obvious difference lies in the degree of participation in the respective crimes. The defendant in *Miller* was only a passive lookout, never handled a gun, and had less than a minute to contemplate the entire situation. In this case, the testimony indicated that defendant was planning to commit a robbery with Knighten and that he was both the instigator of the sexual assaults and the only one holding the gun during and after the incident. Unlike the defendant in *Miller*, defendant in this case is not being sentenced solely on the theory of accountability. Instead, the evidence established that he is a predator who is being held accountable for his own actions, namely, his degrading sexual assault, at gunpoint, of a terrified young girl, following which he turned the victim over to his partner, who also sexually assaulted her. It is precisely this type of behavior that the sentencing provisions were designed to address.

¶ 83    Another significant difference lies in the fact that the defendant in *Miller* who received a life sentence without the possibility of parole, had no opportunity to demonstrate rehabilitation. The supreme court found it unconscionable that the defendant, who was 15 years old at the time of the offense and whose participation in the offense was marginal, would be dismissed as incorrigible. Here, by contrast, defendant was given 32 years, the minimum sentence allowed by law, to be served at 85%. This sentence enables defendant to become rehabilitated and restored to society as a useful citizen.

¶ 84    We reject the challenge under the proportionality clause.

¶ 85                              2. The Due Process Clause

¶ 86    "To pass muster under the due process clause, a penalty must be reasonably designed to remedy the particular evil that the legislature was targeting." *Sharpe*, 216 Ill. 2d at 531. As defendant recognizes, the purpose of mandatory consecutive sentencing is to "deter further assaults or repeated violations against a victim" once the initial assault has been completed. *Toliver*, 251 Ill. App. 3d at 1100. Defendant suggests that, "[b]ecause [defendant] was not involved in the commission of the second offense against [K.H.], the mandatory consecutive [sentencing] statute as applied to [defendant] does not remedy the particular evil of deterring further offenses against a victim." Defendant overlooks his actions that enabled Knighten's assault on K.H. It was defendant who pointed the gun at K.H.'s side while he and Knighten led her behind some bushes. It was defendant who pointed the gun at K.H.'s head while she performed oral sex on him. Defendant's departure with the gun did not relieve K.H. of the compulsion she felt to comply with the demands of her attackers. Defendant was the instigator of these successive assaults, and this case presents the very evil that mandatory consecutive sentencing was meant to address. We reject defendant's due process challenge to his sentence of 32 years.

¶ 87                                    III. CONCLUSION

¶ 88        For the foregoing reasons, we affirm the judgment of the circuit court of Lake County.

¶ 89        Affirmed.