# Illinois Official Reports

## Appellate Court

***People v. Ross*, 2017 IL App (4th) 170121**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. JAMES A. ROSS, Defendant-Appellee.–THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. RYAN A. SCHRIEFER, Defendant-Appellee. |
| District & No. | Fourth District<br>Docket Nos. 4-17-0121, 4-17-0122 cons. |
| Filed | December 19, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Piatt County, Nos. 16-CF-24, 16-CF-29; the Hon. Gary A. Webber, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Dana Rhoades, State's Attorney, of Monticello (Patrick Delfino, David J. Robinson, and David Mannchen, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.<br><br>Mark D. Lipton and Matthew D. Lee, of Meyer Capel, P.C., of Champaign, for appellees. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion.<br>Presiding Justice Turner and Justice Holder White concurred in the judgment and opinion. |

**OPINION**

¶ 1    The State charged defendants, James A. Ross and Ryan A. Schriefer, with unlawful possession with intent to deliver cannabis while within 1000 feet of a school (720 ILCS 550/5.2, 5(e) (West 2014)) and the unauthorized production or possession of cannabis sativa plants (720 ILCS 550/8(d) (West 2014)). The charges against both defendants arose out of the same underlying set of facts. Both defendants filed motions seeking to suppress evidence they argued was improperly obtained as the result of a defective search warrant. The trial court granted defendants' motions. The State appealed in each case, and its appeals were consolidated. We reverse the trial court's grant of defendants' motions and its suppression of evidence and remand for further proceedings.

¶ 2                                    I. BACKGROUND

¶ 3    On April 13, 2016, law enforcement officers searched a structure on property located at the northeastern corner of Greely and Chestnut Streets in Monticello, Illinois, pursuant to a search warrant issued earlier the same day. The record reflects the property at issue was a single lot with two buildings—a tan, two-story house and a blue, barn-shaped building that, at some point, had been used as a residence. The search at issue was of the tan house, which had a front door that faced Chestnut Street and the numbers 1002 displayed on the front of the home. The barn was associated with a street address of 817 North Greely Street in Monticello and was located north of the tan house. The search warrant set forth the street address of the property to be searched as 817 North Greely Street and further described it as follows: "A single family, tan, two[-]story dwelling located on the east side of North Greely Street with the number 817 displayed on the front, a detached barn to the north of the residence[.]"

¶ 4    During the search, law enforcement officers discovered cannabis and cannabis production materials. Thereafter, the State charged both defendants—Ross in case No. 16-CF-24 and Schriefer in case No. 16-CF-29—with unlawful possession with intent to deliver cannabis while within 1000 feet of a school (720 ILCS 550/5.2, 5(e) (West 2014)) and the unauthorized production or possession of cannabis sativa plants (720 ILCS 550/8(d) (West 2014)).

¶ 5    On July 28, 2016, defendant Schriefer filed a motion to suppress evidence. He argued the structure searched—the tan house—was a residence located at 1002 East Chestnut Street and that the search was unconstitutional because no search warrant was issued for that specific address. Rather, the search warrant referenced only a residence at the location of 817 North Greely Street in Monticello, Illinois. Additionally, Schriefer argued the facts that established probable cause for the issuance of the search warrant pertained to the residence at 817 North Greely and not the residence located at 1002 East Chestnut.

¶ 6    Defendant Ross also sought to suppress evidence obtained as a result of the search warrant. Specifically, on August 11, 2016, he filed a motion to quash search warrant and suppress evidence. Similar to Schriefer, Ross alleged the search warrant was defective because it set forth an address different than the one that was searched. Additionally, he alleged that allegations of fact contained in the complaint for the search warrant were insufficient to establish probable cause that a crime was being committed.

¶ 7        On November 15, 2016, the trial court conducted a consolidated hearing on the motions to suppress, and defendants presented the testimony of three law enforcement officers. Piatt County Sheriff David Hunt testified he was involved with the investigation of a residence located at 817 North Greely and/or 1002 East Chestnut. He stated Greely Street and Chestnut Street intersected, with Greely Street running north and south and Chestnut Street running east and west. The residence at issue was located northeast of the intersection, and Hunt agreed it was a tan building. When asked to described the buildings or homes "on that block," Hunt testified as follows:

> "I don't know all the buildings on that block. There's the vacant residence that's in question, whether it's at 817 [North Greely] or 1002 [East] Chestnut. Then to the east is the Pittman residence, Donna and Leonard Pittman which I know, and then there's a residence to the north which is Mrs. Hislope. She's an elderly woman and I went to school with her son. So there's only three residences on that property—I'm sorry, in that block, that you would consider houses."

¶ 8        Hunt testified he received a report of suspicious activity at the residence from Donna Pittman, his high school friend and a neighbor "of that residence." Specifically, Pittman reported that "people were coming and going from that residence." Initially, she believed they were remodeling the residence, but the activity went on for almost a year with no apparent construction taking place. Pittman also noticed that windows to the residence were covered with a black material, and she observed people "bringing in pipes, buckets, tubing[,] and things like that."

¶ 9        Following Pittman's report, Hunt briefed his deputies on the information. He stated Sheriff's Deputy Justin Ernst reported driving north on Greely Street and smelling an odor of cannabis as he drove by the residence. Following Ernst's report, Hunt also drove by the property. He stated he rolled down the windows in his patrol vehicle, slowly drove north on Greely Street, and smelled an odor of cannabis. Hunt testified he was "just north of Chestnut Street" and had "just crossed the intersection when [he] could smell it." He stated he determined the wind was blowing out of the northeast and toward either the west or southwest. Hunt acknowledged that he did not travel east on Chestnut to determine if he could detect a smell of cannabis, noting all of the information he obtained from Pittman centered on the residence at the corner of Greely and Chestnut. Additionally, Hunt asserted that there was "nothing but a corn field to the east. There's railroad tracks and a corn field, just an open field."

¶ 10       Hunt stated he did not "actually go check the numbers" that were affixed to the front of the target residence. In particular, he testified that, at no point prior to the execution of the search warrant, did he observe the digits 1002 on the front of the residence. Hunt testified that, after driving north on Greely and smelling cannabis, he met up with Ernst. He and Ernst then drove south on Greely "and could smell [cannabis] once again." Thereafter, Hunt and his deputies secured the area and monitored the residence. He directed Sergeant John Russell to draft a search warrant and stated he "left it up to *** Russell to do the search warrant." Hunt testified Russell had done many search warrants and "would do a check on the residence." He relied on Russell to make sure that the contents of the search warrant were correct.

¶ 11       Hunt further testified that he was involved in the execution of the search warrant and believed he was the first law enforcement officer in the house. He stated he drove into the

driveway at the back of the residence and went to the back door, believing it to be "the door that was being used to enter and exit the residence." Hunt testified law enforcement officers knocked and announced and then entered the residence. He stated he was aware that Russell was at the front of the residence "to watch the front door in case somebody was coming out."

¶ 12    On both direct and cross-examination, Hunt was shown photographs from which he identified the residence that was the target of the law enforcement investigation, *i.e.*, the tan, two-story house. He also identified the Pittman residence and a "building *** behind the target residence," *i.e.*, the blue barn.

¶ 13    Ernst testified he was involved in the investigation of a home located at the intersection of Greely and Chestnut Streets. He drove by the residence after Hunt advised him that there was "suspicious activity." Ernst stated he traveled north on Greely Street and, when he was just north of Chestnut Street, he smelled the odor of cannabis. At no point did he observe the street address affixed to the target residence. Further, Ernst testified he was involved in the execution of the search warrant. Specifically, he stated he made entry into the home with other officers and identified the "north door" at the rear of the residence as the officers' point of entry.

¶ 14    Ernst testified he did not know who made the decision to enter the residence through the north door. He stated there was also "a front door" that faced Chestnut Street, but he did not see anyone using that door. Ernst acknowledged, however, that he had never been to the residence before and did not know whether the front door opened and closed. He also never saw anyone using the rear door, but he did see a vehicle "parked back there."

¶ 15    Russell testified he had been with the Piatt County sheriff's office for 25 years and was familiar with an investigation of a residence located at the corner of Greely and Chestnut Streets. Specifically, he received information from Hunt about a report of unusual activity at the residence and then passed that information to the deputies so they could drive by the location. Russell testified he also researched the address and stated his "research indicated that the residence was underneath one address, 817 N. Greely."

¶ 16    Russell testified he drafted a search warrant based on the officers' observations of the location. He did not personally visit the address in question prior to preparing the complaint for a search warrant. Russell identified copies of the complaint for a search warrant he prepared and the search warrant that was issued, both of which identified the target residence as being located at "817 N. Greely Street" in Monticello.

¶ 17    Russell stated that, during the execution of the search warrant, his "function was security on the Chestnut side of the residence." He stated he was facing the south side of the house "where the front door faces." Russell identified photographs of the target residence showing the number 1002 displayed on a front pillar of the house. The following colloquy occurred between defendant Ross's counsel and Russell:

"Q. And as you were stationed out on the Chestnut side of the street, at what point did you observe that the address read 1002?

A. When we arrived, *** we got out, we secured the front side while they made their entry at the back, and when I looked at the front of the residence, I saw the numbers 1002.

Q. And what, if any[thing], did you do at that time?

A. There was nothing to do. They already made contact at the rear of the residence. We were at the front of the residence.

* * *

Q. So again, I'm going to be back to the moment that you realized that the number 1002 was located at the front of the residence. You testified that at that time there was nothing left to do because it was too late. What do you mean by that?

A. When I noticed the numbers 1002 at the front, I could hear them at the back knocking on the door yelling [']search warrant, search warrant['].

Q. So in other words when you realized that 1002 was on the front, they were knocking on the door and had not yet entered, correct?

A. The door—they were yelling [']search warrant, search warrant,['] and that's the breach, which means the door was opening, somebody was present.

Q. But you heard knocking at the door, correct?

A. I didn't hear knocking. I could hear them yelling [']search warrant, search warrant.[']

Q. Well I just want to, make sure that—I thought you were the one that brought up the knocking, so I want to make sure your testimony is accurate.

A. Normally what they do is they knock and they announce, and I heard them yelling, so I assumed that they did knock.

Q. Okay so you you're [*sic*] assuming that they knocked contemporaneously with them announcing; is that fair to say?

A. Yes.

Q. And when you say announcing, that is the moment in which they're preparing to enter the home, correct?

A. That is when they were at the back of the door, and when I looked up and saw the numbers, I could hear them saying [']step out, step out, step out,['] which means they made contact at the door and somebody was coming out."

¶ 18    Russell acknowledged that when he saw the number 1002 on the house he had no knowledge as to whether any contraband or anything illegal had been seized. Also, he admitted he had been equipped with a walkie-talkie so that he could communicate with the officers who were at the rear of the home.

¶ 19    Russell further testified that the complaint for a search warrant that he prepared contained the following allegations:

"[A] check of the records at the Piatt County Court House indicate[s] that the owner of record is Ryan W. Spomer, 110 Bryce Lane Tolono, IL. The records indicate that the residence is controlled by a Corporate Warranty Deed. A check with the City of Monticello indicates that the house was last occupied in 2011. There is no water service to the residence. A check with Ameren Illinois Power indicates that 817 N. Greely Street, Monticello[,] IL[,] has an active account under a property management corporation. The last four bills indicate usage in the amounts of $10.72, $16.11, $17.70, and $17.63 ***."

Russell agreed that the foregoing information did not apply to the target residence; however, he asserted he did not know that at the time he prepared his complaint. He believed the "legal address of that whole parcel [was] 817 N. Greely."

¶ 20    Russell testified, later, he looked up records associated with 1002 East Chestnut Street. He stated he went to the clerk's office "to determine why it showed 817 on the computer, and they explained it was two different properties consolidated into one." Russell also learned that separate Monticello city water and Ameren Illinois Power accounts existed for 1002 East Chestnut.

¶ 21    Russell testified that to determine the address for the target residence, he went to the "Piatt County tax assessment web site" that another deputy was familiar with. He "clicked on" property that he knew the target residence sat upon and the address that was given was "817 N. Greely." Russell testified that there was a building to the north of the target residence, which he described as "a barn that at one point in time used to be a residence." He stated that building "generally was shaped like a barn" and was associated with the 817 N. Greely Street address. According to Russell, the barn was not searched, but some officers may have looked inside and determined "it was being used for storage." During his follow-up investigation he learned that the barn had been unoccupied since 2011. Further, he stated that the previously identified information in his complaint for a search warrant, which did not apply to the target residence, actually applied to the barn.

¶ 22    Russell asserted that the target residence and the barn were "basically two buildings on the same tract of property." He stated it was his understanding that title to the "whole property[,] both 1002 and 817," was transferred by a corporate warranty deed. At the hearing, Russell identified a copy of a corporation warranty deed showing that property with a "Common Address" of "817 N. Greely and 1002 E. Chestnut-Monticello, IL 61856" was transferred to Ryan Spomer by Central Financial Loan Corporation in 2011. Russell also identified a document entitled "PTAX-203 Illinois Real Estate Transfer Declaration" that contained property and sale information and which listed the street address of the property at issue as "817 N. Greely (and 1002 E. Chestnut)" in Monticello.

¶ 23    Additionally, Russell testified that his descriptions of the target residence in the complaint for a search warrant and the search warrant were accurate except for the assertions that the residence had "the number 817 displayed on the front." Finally, Russell testified that the search warrant was executed at the back door of the residence because vehicles were parked at that location and "[t]he assumption was made that that was their point of going in and out of the building."

¶ 24    At the conclusion of the hearing, the trial court rejected defendants' arguments regarding probable cause but, nevertheless, found the search warrant was not valid because "it did not specifically state the place, that there [was] some ambiguity on the search warrant and that was not cured prior to the search warrant being entered." The court ordered any evidence obtained pursuant to the execution of the search warrant suppressed.

¶ 25    On November 22, 2016, the State filed motions to reconsider the trial court's ruling in both cases. It argued that law enforcement officers searched the residence that was the target of their investigation and proceeded in good faith. Further, the State maintained the search was not unconstitutional or the result of officer misconduct and contended case law relied upon by the court in reaching its decision was factually distinguishable. The record reflects, in connection with its motion, the State also argued defendant Schriefer failed to establish his

standing to challenge the search warrant by demonstrating what interest he had in the targeted residence.

¶ 26 Both defendants also filed a motion to reconsider the trial court's ruling, arguing the court erred in finding probable cause existed for the issuance of the search warrant. Relative to the issue of standing, defendant Schriefer argued the State forfeited the issue by not raising it until after the conclusion of the suppression hearing. Further, he maintained the State had given up its right to argue that he lacked standing where it charged him based on the theory that he was legally accountable for the cannabis found during the search. Schriefer also maintained that it was "undisputed" that he owned the house at issue. He asserted he owned the property "along with his business partner, Ryan Spomer." Schriefer asserted he and Spomer jointly owned a company that held the deed to the property.

¶ 27 On February 10, 2017, the trial court conducted a hearing in the matter and denied all of the motions to reconsider. With respect to the issue of defendant Schriefer and his standing to challenge the search warrant, the court denied a request by Schriefer's counsel to present Schriefer's testimony and ruled that the issue was not a proper subject of a motion to reconsider and the State had waived the issue.

¶ 28 These appeals by the State followed.

¶ 29 II. ANALYSIS

¶ 30 A. Standing

¶ 31 On appeal, the State initially argues the trial court's grant of defendant Schriefer's motion to suppress was improper because "Schriefer failed to establish any reasonable expectation of privacy as to the property searched." It contends Schriefer had the burden of demonstrating that he had standing to challenge the search but presented "no evidence at all regarding any interest he might have had as to the property in question." The State acknowledges that it did not raise the issue of Schriefer's standing until it filed its motion to reconsider. However, it maintains that, contrary to the trial court's finding, the issue of standing was a proper subject of its motion to reconsider because "[g]ranting a motion to suppress to a defendant who has failed to establish standing at all is an error of law."

¶ 32 The purpose of a motion to reconsider is to bring the trial court's attention to (1) newly discovered evidence that was unavailable at the time of the original hearing, (2) changes in the law, or (3) errors the court made in its application of existing law. *People v. Wear*, 371 Ill. App. 3d 517, 531, 867 N.E.2d 1027, 1039 (2007). An argument made for the first time in a motion to reconsider is forfeited on appeal. *People v. Moravec*, 2015 IL App (1st) 133869, ¶ 24, 44 N.E.3d 538; see also *Evanston Insurance Co. v. Riseborough*, 2014 IL 114271, ¶ 36, 5 N.E.3d 158 ("Arguments raised for the first time in a motion for reconsideration in the circuit court are forfeited on appeal."). Further, "a trial court's ruling on a motion to reconsider is within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion." *Vantage Hospitality Group, Inc. v. Q Ill Development, LLC*, 2016 IL App (4th) 160271, ¶ 51, 71 N.E.3d 1. Here, we find no abuse of discretion by the trial court in the manner in which it addressed the State's motion.

¶ 33 First, in arguing that the trial court erred by addressing the merits of Schriefer's motion to suppress before considering whether he had standing, the State points out that a defendant has the burden of establishing his standing to challenge a search. *People v. Nichols*, 2012 IL

App (2d) 100028, ¶ 41, 964 N.E.2d 1190. Also, it cites *People v. Ervin*, 269 Ill. App. 3d 141, 145-46, 645 N.E.2d 355, 358 (1994), for the proposition that "[i]n considering a motion to suppress, a court mu*st first* determine whether the defendant had standing to challenge the search and seizure before addressing the merits of the defendant's claim." (Emphasis added.) However, in *Ervin* the State timely raised an argument that the defendant lacked standing during the original hearing. *Id.* at 145, 645 N.E.2d at 358. Neither *Ervin* nor the cases it relied upon involved the circumstances presented by this case, *i.e.*, a failure by the parties to present a standing argument until after the evidentiary hearing had concluded.

¶ 34    Additionally, "[w]hile defendants may have the burden of establishing standing, the burden of objecting to standing is the State's." *People v. Capuzi*, 308 Ill. App. 3d 425, 429, 720 N.E.2d 662, 666 (1999) (rejecting an argument by the State "that the standing issue was raised by virtue of [the] defendants' burden to establish standing"). In this case, the issue of standing was not addressed at all at the hearing on defendants' motions to suppress. As the trial court determined, Schriefer's standing to challenge the search warrant was "not something that the court ruled on," and as a result, there "couldn't be an error in the way the court applied the existing law."

¶ 35    Second, we note the State also cites *People v. Williams*, 186 Ill. App. 3d 467, 470-71, 542 N.E.2d 484, 486 (1989), wherein the Third District determined that the State did not waive the issue of a defendant's standing to challenge a search when it raised the issue for the first time in a motion to reconsider. There, the court did not consider whether the issue of standing was a proper subject of a motion to reconsider when the issue had not previously been raised or addressed by the trial court. Rather, it determined that, because the matter was still pending before the trial court when the issue was raised, the defendant did not seek to present additional evidence, and the defendant suffered no prejudice, the State did not waive the issue. *Id.* at 470, 542 N.E.2d at 485-86. In particular, the court relied heavily on the fact that the defendant's arguments in challenging the search at issue ran counter to arguments he could have made to support his standing to challenge the search. *Id.* at 470, 542 N.E.2d at 486 ("The more successful [the] defendant was in [his] claim, the less connection he had to the apartment, and the more tenuous his claim of standing to object to a search of the apartment."). We find *Williams* is factually distinguishable from the present case and not dispositive of the issue.

¶ 36    Further, although a trial court may, in its discretion, consider new matters raised for the first time in a motion to reconsider, it has been held that a court should only do so when the moving party presents a reasonable explanation of why the matter was not raised at the time of the original hearing. *Delgatto v. Brandon Associates, Ltd.*, 131 Ill. 2d 183, 195, 545 N.E.2d 689, 695 (1989). Here, the State offered no explanation to the trial court as to its failure to previously raise the standing issue. Further, the argument that Schriefer lacked standing to challenge the search warrant was wholly available to the State at the time of the suppression hearing. Given the circumstances presented, we can find no abuse of discretion by the trial court in denying the State's motion to reconsider.

¶ 37                            B. Suppression of Evidence

¶ 38    On appeal, the State next argues the trial court erred in granting defendants' motions to suppress based on "a discrepancy in the address" contained in the search warrant. It contends that despite the error as to the target residence's street address, the search warrant's

description of that residence was otherwise sufficient to allow law enforcement officers to know where to conduct the search. The State further asserts that suppression is unwarranted under the good-faith exception to the exclusionary rule.

¶ 39    We apply a two-part test when reviewing a trial court's ruling on a motion to suppress evidence. *People v. Boston*, 2016 IL 118661, ¶ 18, 49 N.E.3d 859. "First, we will uphold the trial court's factual findings unless they are against the manifest weight of the evidence." *Id.* "Second, we review *de novo* the trial court's ultimate legal conclusion as to whether suppression is warranted." *Id.*

¶ 40    A valid search warrant must particularly describe the place or person to be searched and the things to be seized. 725 ILCS 5/108-3(a) (West 2014). "The purpose of this requirement is to prevent the use of general warrants that would give police broad discretion to search and seize." *People v. Burmeister*, 313 Ill. App. 3d 152, 158, 728 N.E.2d 1260, 1266 (2000).

¶ 41    "Generally, an otherwise valid warrant will not be quashed due to technical errors not affecting the substantial rights of a defendant." *Id.*; 725 ILCS 5/108-14 (West 2014) ("No warrant shall be quashed nor evidence suppressed because of technical irregularities not affecting the substantial rights of the accused."). "[E]rrors or omissions in addresses are not *per se* fatal to the validity of a search warrant" and "[a] warrant must simply identify the place to be searched to the exclusion of all others." *Burmeister*, 313 Ill. App. 3d at 158, 728 N.E.2d at 1267.

¶ 42    "A warrant is sufficiently descriptive if it enables the officer, with reasonable effort, to identify the place [to be searched]." *People v. Watson*, 26 Ill. 2d 203, 206, 186 N.E.2d 326, 327 (1962). However, "where a search warrant raises a question in an officer's mind as to which premises to search, the warrant should not be executed, because officers are prohibited from using their own discretion to determine which premises to search." *People v. Urbina*, 393 Ill. App. 3d 1074, 1078, 916 N.E.2d 1, 6 (2009). "Whether a warrant satisfies the requirements of particularity is determined on a case-by-case basis." *People v. Economy*, 259 Ill. App. 3d 504, 512, 631 N.E.2d 827, 833 (1994).

¶ 43    In this instance we agree with the State's contentions on appeal and find that, excluding the error as to street address, the search warrant was otherwise sufficiently descriptive. The search warrant identified the property to be searched as "[a] single family, tan, two[-]story dwelling located on the east side of North Greely Street *** [with] a detached barn to the north of the residence." The record reflects the property at issue on appeal consisted of a single lot with two buildings—a tan, two-story, conventionally shaped house and a blue, barn-shaped structure. As described in the search warrant, the barn was located to the north of the residence, and the entire property was located on the east side of North Greely Street.

¶ 44    Nothing in the record indicates law enforcement officers executing the search warrant were confused or doubtful about which building to search or that they exercised any discretion in determining where to search. Similarly, no evidence showed that another similar property was located in the area, *i.e.*, one with a "single family, tan, two[-]story dwelling" with "a detached barn to the north of the residence." Further, the same officers who were involved in the investigation of the target residence were involved in the execution of the search warrant. See *Burmeister*, 313 Ill. App. 3d at 158, 728 N.E.2d at 1267 ("Inaccuracies will not necessarily invalidate a warrant if the officer applying for the warrant also executed the warrant.").

¶ 45    Defendants respond to the State's arguments by arguing that the warrant's description of the property was too vague to exclude all other buildings. However, in setting forth the language used in the warrant, defendants fail to include the part of the description that references "a detached barn to the north of the residence." The presence of the barn is a distinguishing feature of the property on which the targeted residence sat. Further, the use of the barn to describe the location of the target residence indicates that the barn itself was not the target of the search. To the extent defendant asserts officers would have been confused regarding whether the search warrant applied to the tan house or the blue barn, we disagree.

¶ 46    Additionally, the record shows the complaint and affidavit for a search warrant described the target residence as sitting "on the northeast corner of N. Greely and E. Chestnut Streets," thereby more precisely describing the street location of the place to be searched. We note an affidavit for a search warrant may be used "in determining the validity of a search warrant *** where the affidavit is attached to the warrant, incorporated by reference, or *** where the officer who signed and swore to the affidavit also executed the search warrant." *People v. Fragoso*, 68 Ill. App. 3d 428, 433, 386 N.E.2d 409, 413 (1979). In this instance, Russell both signed and swore to the affidavit and was involved in the execution of the search warrant. Moreover, Hunt and Ernst both were involved in the underlying investigation, provided information to Russell, and also participated in the search.

¶ 47    On appeal, defendants challenge the State's position that the error in the search warrant was a mistake that was unknown to the officers. Specifically, they argue that Russell's research prior to obtaining the search warrant "revealed that there were two residences with separate addresses—including photographs that clearly identified which address went with which house." To support their argument, defendants cite portions of Russell's testimony at the suppression hearing and exhibits presented by the State, containing a copy of the corporate warranty deed and records from the assessor's office that include photographs of the target residence and barn. We find the record does not support defendants' assertions.

¶ 48    Here, the trial court's comments when ruling on defendants' motions indicate it determined that Russell was unaware of the separate addresses when applying for the search warrant or that he knew he was using an incorrect address to describe the target residence. As discussed, we will not overturn the trial court's factual determinations on review unless they are against the manifest weight of the evidence. In this instance, the record supports the court's findings.

¶ 49    At the suppression hearing, Russell testified that, although he was aware that the barn had been used as a residence "way back in the 90s," at the time he applied for the warrant, he believed it was unoccupied. Also, he stated he believed 817 N. Greely "was the residence at the corner, and the barn was part of that property. The legal address of that whole parcel [was] 817 N. Greely." Russell stated he identified the address online from the "Piatt County tax assessment web site." He testified he "clicked on" property that he knew the target residence sat upon and the address that was given was "817 N. Greely." The record does not contain a factual basis for finding the specific exhibits referenced by defendants were reviewed by Russell prior to when he applied for a search warrant or before the search warrant was executed. In particular, it does not show that Russell reviewed photographs of either the house or the barn, or documentation identifying the buildings by separate addresses, when applying for a search warrant.

¶ 50    On appeal, the parties also cite several cases to support their respective positions. As indicated, each case involving the validity of a search warrant turns on its own particular set of facts. However, we find this case most closely resembles those cases relied upon by the State.

¶ 51    In *Watson*, 26 Ill. 2d at 205, 186 N.E.2d at 327, the defendant sought to suppress evidence obtained as the result of a search warrant that set forth an incorrect street address for an apartment building. The supreme court upheld the denial of the motion, noting that technical descriptions are unnecessary and "[c]onstitutional requirements relating to searches are satisfied *** if the warrant describes the premises to be searched with reasonable certainty." *Id.* at 205, 186 N.E.2d at 327.

> "If the property is sufficiently recognizable from the description to enable the officer to locate the premises with definiteness and certainty, it is adequate. The description may be one used in the locality and known to the people; and by inquiry the officer may be as clearly guided to the place intended as if the legal record description were used. [Citation.] The constitutional safeguard is designed to require a description which particularly points to a definitely ascertainable place so as to exclude all others." *Id.* at 206, 186 N.E.2d at 327.

The court found that, in the case before it, the error in address was "of no consequence in view of the other identifying factors which removed any doubt or ambiguity from the description." *Id.*

¶ 52    Similarly, in *People v. Powless*, 199 Ill. App. 3d 952, 953, 557 N.E.2d 946, 947 (1990), the defendant challenged a search warrant that misidentified the name of the street on which the house to be searched was located. The Second District found the trial court properly rejected the defendant's challenge, stating as follows:

> "In spite of the mistaken address, there was no evidence that the officers who executed the warrant at issue had any doubt or exercised any discretion concerning the premises they were authorized to search. There was, however, considerable evidence of other factors contained in the warrant which served to identify the house. Under these circumstances, we hold that the incorrect address on the warrant constituted a technical defect which created no reasonable possibility of confusion." *Id.* at 957, 557 N.E.2d at 950.

¶ 53    Like in *Watson* and *Powless*, the search warrant in this case was sufficiently descriptive so as to identify the correct place to be searched to the exclusion of all others. Additionally, the law enforcement officers involved in the search exhibited no doubt or confusion as to the house to be searched, nor did they exercise any discretion in determining where to search.

¶ 54    Further, with respect to defendants' argument that the search was improper because Russell took no action to halt it once he saw the numbers 1002 displayed on the front of the target house, we disagree. In *People v. Luckett*, 273 Ill. App. 3d 1023, 1027-28, 652 N.E.2d 1342, 1345 (1995), the defendant challenged a search warrant on the basis that it identified the premises to be searched as " '3604 West Monroe Street, *1st Floor Apartment*,' " when the building at issue actually contained two first-floor apartments. (Emphasis in original.) The existence of two apartments was not discovered by police officers until after they began their search. *Id.* at 1026, 652 N.E.2d at 1344. On review, the First District initially determined the warrant was validly issued because, prior to obtaining the warrant, law enforcement officers

had no reason to believe the first floor of the building contained more than one apartment. *Id.* at 1029, 652 N.E.2d at 1346.

¶ 55    The *Luckett* court next addressed the conduct of law enforcement officers in continuing their search after realizing that the original description of the premises was incorrect. *Id.* at 1030, 652 N.E.2d at 1347. It held that "the touchstone of the analysis" was whether the officers' conduct was reasonable. *Id.* (citing *Maryland v. Garrison*, 480 U.S. 79, 87 (1987)). The court determined the officers in the case before it had acted reasonably in continuing the search, stating as follows:

"[B]y the time police discovered [the existence of two apartments], 'it was too late *** consistent with the success of their mission, to have retreated and obtained a new warrant.' [Citation.] The actions of the officers entering through the front door doubtless alerted occupants to the presence of authority. The nature of the contraband sought was not so large or immobile that it could not be moved while police were attempting to secure another warrant. Indeed, even the posting of an officer outside the house to guard against this sort of behavior would have been futile given that the drugs could have been more thoroughly hidden within the apartment or perhaps, more realistically, destroyed. *** Once the officers realized they were in the wrong apartment, they immediately directed their search to the only other apartment on the first floor, thus precluding any possibility of a fishing expedition. Under the circumstances testified to in this case, we hold that the officers made reasonable efforts to determine which apartment was most likely 'connected with the criminality under investigation and *** confine[d] the search accordingly.' " *Id.* at 1032-33, 652 N.E.2d at 1348-49.

¶ 56    Although not precisely on point, *Luckett* is instructive, and we find the officers in the present case also acted reasonably in continuing to search the house at issue. The record reflects that law enforcement officers had begun executing the search warrant at the time Russell realized an error as to the address set forth in the search warrant. Further, it indicates occupants of the residence had been alerted to the presence of the officers. Moreover, we again note that no confusion or doubt existed as to the residence that was the target of the investigation. The officers knew what house was the subject of the search and searched only that residence. Additionally, for the reasons already stated, we reject defendants' assertions that *Luckett* is distinguishable because Russell had reviewed documents and pictures that identified the existence of separate residences and separate addresses.

¶ 57    Finally, we find this case distinguishable from *Urbina*, 393 Ill. App. 3d 1074, 916 N.E.2d 1, the case most heavily relied upon by both the trial court and defendants. There, a confidential informant provided information to a law enforcement officer about purchases of cocaine he made from a specific apartment. *Id.* at 1075, 916 N.E.2d at 4. The apartment building at issue had four apartments—two located on the first floor and two located on the second floor. *Id.* Based on information obtained from the confidential informant and his own investigation, which included observing two controlled buys from outside the apartment building, the officer applied for and obtained a search warrant that authorized police officers to search "apartment *D*" of the building, located "on the left top of the stairs with the *letter D* affixed to the door." (Emphases in original.) *Id.* When officers went to execute the search warrant, they realized that, contrary to the warrant, "apartment 'D' was to the right, and apartment 'C' was to the left." *Id.* at 1076, 916 N.E.2d at 4. They called to the investigating

officer who was overseeing the search and waiting outside the building to identify the proper apartment. *Id.* The investigating officer "told the officers to search apartment 'C,' which was to the left." *Id.*

¶ 58 On review, the Second District determined evidence obtained as a result of the search must be suppressed, because "the warrant failed to describe with sufficient particularity the premises to be searched." *Id.* at 1079, 916 N.E.2d at 7. It further stated as follows:

> "[T]he warrant in this case was ambiguous when the officers attempted to execute it, leaving doubt in the officers' minds as to which apartment to search. Such doubt was manifested in the \*\*\* request for direction from [the investigating officer]. [The investigating officer] used his discretion and directed the officers to search apartment 'C' in contradiction to the express direction of the warrant. This was an impermissible use of discretion as a matter of law." *Id.*

¶ 59 Unlike the present case, *Urbina* involved a search warrant that contained two competing factual descriptions of the place to be searched, resulting in ambiguity for the officers executing the warrant and an exercise of discretion by the investigating officer. Here, although the warrant contained incorrect information as to the address of the house, it otherwise described the house to be searched in detail, providing information as to color, location, and other surrounding buildings. Thus, the house was described with particularity to the exclusion of all others, including the barn to which the 817 North Greely address actually applied. Further, the error in the search warrant was not discovered until after the officers had already begun executing the warrant and there was no exercise of discretion by the officers involved.

¶ 60 Under the circumstances presented, although the technical address set forth in the warrant was incorrect, the warrant otherwise described the residence to be searched with particularity. Thus, it was sufficiently descriptive to permit law enforcement officers, with reasonable effort, to identify the residence to be searched. In our *de novo* review, we find the trial court erred in granting defendants' motions to suppress evidence obtained in the search. Given these findings, it is unnecessary to address the State's alternative argument that the good-faith exception to the exclusionary rule applies.

¶ 61                                                       III. CONCLUSION
¶ 62 For the reasons stated, we reverse the trial court's judgment and remand for further proceedings.

¶ 63 Reversed and remanded.